ANDRE SAINT LOUIS & others[1] *vs.* BAYSTATE MEDICAL
CENTER, INC., & another.[2]

No. 89-P-859.

Hampden. January 17, 1991. - March 29, 1991.

Present: KASS, KAPLAN, & PORADA, JJ

*Res Judicata. Judgment,* Preclusive effect. *Practice, Civil,* Amendment,
Dismissal. *Contract,* Performance and breach. *Hospital. Unlawful In-
terference. Consumer Protection Act,* Availability of remedy.

Claims asserted in a civil action were barred by principles of res judicata
where all issues raised in the complaint had been raised, or could have
been raised, in a prior action that had been dismissed with prejudice;
where no party involved in the later action was absent from the prior
one; and where the claims in both actions were derived from the same
transaction or series of connected transactions. [396-402]
A complaint by physicians who lost staff privileges at a certain hospital, in
accordance with hospital by-law provisions terminating such privileges
solely for lack of use, stated no claim against the hospital for breach of
contract. [402-403]
A defendant could not be liable on a common law claim of tortious inter-
ference with advantageous relations between itself and a plaintiff, or on
a claim under G. L. c. 93A based on the same theory. [404-405]

CIVIL ACTION commenced in the Superior Court Depart-
ment on June 4, 1985.

The case was heard by *William W. Simons,* J., on motions
for summary judgment.

*Mitchell J. Sikora (Ann Ryan-Small & Myles D. Jacob-
son* with him) for the plaintiffs.

*Francis D. Dibble, Jr.,* for Baystate Medical Center, Inc.
*Gordon P. Katz* for Springfield Anesthesia Service, Inc.

---

[1]Peter Sellei, Mark Lempert, and Vijay Joshi, and Wesson Anesthesia
Group, Inc. The individual plaintiffs are all physicians specializing in
anesthesiology and were shareholders of the corporate plaintiff.

[2]Springfield Anesthesia Service, Inc.

KASS, J. When, in 1976, the Medical Center of Western Massachusetts[3] merged with Wesson Memorial Hospital to form Baystate Medical Center, Inc. (Baystate), it became necesssary also to fuse, at least in the sense of coordination, the anesthesia services of the previously separate institutions. That process was not successful and provoked a series of legal actions of which this case is the third. A judge of the Superior Court, acting on defense motions for summary judgment, concluded that all issues raised by the complaint had been, or could have been, raised in a prior State action which had been dismissed with prejudice. Accordingly, the judge ruled that further proceedings in the instant case were barred by principles of res judicata. Judgment was entered for the defendants, and the plaintiffs have appealed.[4]

We think principles of res judicata were aptly applied. It is also possible, on the basis of the summary judgment materials, to affirm the judgment on the merits. The controversy has been so tortuous and combative that we shall express briefly our views on the merits, in hope that doing so will more definitively put the dispute to rest.

1. *Facts.* Here is the background. Wesson Anesthesia Group, Inc. (WAG), a group practice specializing in anethesiology, had before the merger creating Baystate supplied anesthesia services to Wesson Memorial Hospital. At the Springfield Hospital and Wesson Women's Hospital, those services were furnished by another group, Springfield Anesthesia Service, Inc. (SAS). Of the two professional corporations, SAS was the larger, performed teaching functions with residents in training, and seems to have had somewhat greater academic panache.

After the merger, the administrators of Baystate retained both anesthesia groups but designated a single head of the department of anesthesiology of Baystate. The physician so designated was Dr. Franco Dinale, a member of SAS. Mem-

---

[3]That institution was itself the product of a merger of Springfield Hospital and Wesson Women's Hospital.

[4]Counsel for the plaintiffs in this appeal was not trial counsel and did not participate in the Superior Court or Federal Court litigation.

bers of the groups did not become employees of Baystate; rather, Baystate entered into contracts with the two professional corporations under which they provided physicians who would administer or supervise anesthesia and furnish qualified anesthesiologists on schedule and on call. The groups billed patients for their services and remitted to Baystate costs attributable to space, equipment, medicines, and assisting personnel.

As early as 1979, the record discloses, there was friction about methods, coverage, and style between the two groups. The WAG doctors bridled under Dr. Dinale's leadership. A periodic review in 1980 of practice at Baystate by the Medical Malpractice Joint Underwriting Association of Massachusetts (JUA) generated criticism directed particularly at the WAG anesthesiologists. It was said that they permitted operating rooms to be unattended by an anesthesiologist, leaving only unsupervised nurse anesthetists to care for patients. JUA thought this inconsistent with proper standards and asked that the practice be discontinued. Proposals for reprimand of WAG physicians and remedial policies came before the medical executive committee and the Baystate trustees. After hearings and reports, mild letters of reprimand issued to five WAG doctors, and, more pointedly, the trustees on February 13, 1981, directed Dr. Dinale to prepare a plan for greater integration of the anesthesiology units. A feature of the plan that Dr. Dinale devised was that two doctors from WAG were to rotate through the main Springfield campus, while, reciprocally, two doctors from SAS rotated through the Wesson campus.

For the WAG physicians this was all too much, and they filed an action asserting multiple grievances against Baystate, which we shall detail below, but which added up to the generalized complaint that Baystate and SAS (which was brought in as a party later) were bent on driving WAG out of Baystate. Bringing a lawsuit did not enhance the cause of cooperation, integration, and good feeling. Sporadic outbursts of ill temper, rudeness, and quarrels about scheduling erupted. On one or more occasions, WAG could not supply

physicians to Baystate when needed because they had commitments to other hospitals.

In response to a call from the hospital administration for a more unified anesthesiology department, a majority of the department proposed a staffing plan which included two elements WAG found particularly unpalatable: (1) all members of the department of anesthesiology were to be full time; and (2) the chief of the department would make all hiring decisions. The trustees adopted the department's staffing recommendations on August 13, 1982. At the same meeting, Baystate's vice president for medical affairs suggested that a contract with a single practice corporation might be the best way to achieve a truly integrated department. The suggestion quickly became policy. In early October, 1982, Baystate requested that SAS and WAG submit proposals for being the sole staffing source for the anesthesiology department. SAS received the nod from the hospital board, and an exclusive contract was made in February, 1983, to be effective September 1, 1983. That triggered a second lawsuit by WAG and its member physicians, this time brought in the United States District Court and filed May 25, 1983.

1. *Res judicata.* Thus far we have mentioned two legal actions brought by WAG and its constituent physicians: the first action, filed on April 27, 1981, in Superior Court, and the second action, filed in Federal court on May 25, 1983. The case before us, the third action, was begun by complaint filed in Superior Court on June 4, 1985. In all three cases the plaintiffs were WAG and four (originally five)[5] of its shareholder-physicians. The defendants named in the first action were Baystate, Dr. Dinale in his role as chairman of the department of anesthesiology, and SAS. In the second and third actions the defendants were Baystate and SAS. No party involved in the third action was absent from the first action and the identity of parties necessary to invoke princi-

---

[5]In the first action the lead plaintiff was Dr. Anil K. Chakrabarti, joined by Drs. St. Louis, Joshi, Lempert, and Sellei, as well as WAG. A stipulation of dismissal as to Dr. Chakrabarti was entered on May 25, 1983. He was not involved in the second action or the third action.

ples of res judicata or former adjudication (the phrase pre-
ferred by the Restatement [Second] of Judgments [1980]) is
present. *Fidler* v. *E.M. Parker Co.*, 394 Mass. 534, 539
(1985). *Bradford* v. *Richards*, 11 Mass. App. Ct. 595, 597
(1981). Cf. *Morganelli* v. *Building Inspector of Canton*, 7
Mass. App. Ct. 475, 480-482 (1979). Restatement (Second)
of Judgments § 17(3).

The complaint in the first action alleged unlawful interfer-
ence with contractual relations; bad faith violation of agree-
ments between the plaintiffs and Baystate; deprivation with-
out fair hearing of the plaintiffs' rights to practice medicine;
unfair and unconstitutional retaliation against the plaintiffs
because they gave voice to opinions contrary to those held by
the hospital administration and Dr. Dinale; unfair and decep-
tive practices in violation of G. L. c. 93A; unlawful restric-
tion of the plaintiffs' rights to practice medicine in violation
of G. L. c. 93, §§ 1-14A (the Massachusetts Antitrust Act);
and defamation. In addition to damages, WAG[6] asked that
Baystate be enjoined from interfering with the clinical privi-
leges of the WAG physicians or establishing work schedules
which would interfere with commitments of those physicians
to other hospitals. WAG's attack had not been unleashed on
a narrow front.

For some years the first action lurched through the discov-
ery phase. In 1982, WAG moved for leave to claim a jury,
and that motion was denied. The second action, initiated in
1983, appears to have been instituted for two reasons. First,
it afforded WAG an opportunity to claim a jury; second, a
Federal court would be a promising forum in which to press
Federal antitrust claims based on an opinion of the United
States Court of Appeals for the Fifth Circuit favorable to the
idea that an exclusive agreement with a professional medical
corporation (in fact, a group of anesthesiologists) violated
Federal antitrust law. See *Hyde* v. *Jefferson Parish Hosp.
Dist. No. 2*, 686 F.2d 286 (5th Cir. 1982). The complaint in
the second action contained a mere ninety-six paragraphs. In

[6]For convenience of reference we shall use WAG as a collective term for
all the plaintiffs.

addition to the Federal antitrust points, it restated the G. L. c. 93 and 93A claims, tortious interference with contractual relations, and breach of contract.

The life of the *Hyde* decision was short. The Supreme Court reversed it in *Jefferson Parish Hosp. Dist. No. 2* v. *Hyde*, 466 U.S. 2 (1984), holding that an exclusive staffing arrangement by a hospital was not an unlawful tying arrangement. WAG moved on August 24, 1984, to dismiss the Federal claims and certain State claims with prejudice but to dismiss without prejudice State claims founded on breach of contract, tortious interference with contractual relations, and violations of G. L. c. 93A. An immense amount of effort had been expended on discovery in the second action, and the defendants were reluctant to allow the Federal action to expire until WAG had responded to certain residual discovery by the defendants. On November 14, 1984, a United States District Court judge, acting on a proposed order by a United States magistrate, dismissed the complaint in the second action, expressly disavowing any attempt to approve subsequent action in a State forum or any attempt to modify the existing State action. The dismissal, insofar as it was with prejudice, was limited as to those Federal and State claims which asserted conduct in restraint of trade, i.e., antitrust violations. Entry of that order remained in abeyance until WAG complied with the unsatisfied discovery orders and the payment of sanctions that had been assessed against WAG for failure to comply with discovery orders. The dismissal was eventually entered on the docket on May 7, 1985.

Meanwhile, the first action was called for trial on January 30, 1985. That would have been a trial without a jury. WAG elected not to proceed and joined in a stipulation of dismissal of the action with prejudice. The docket entry was made February 12, 1985. There was no acquiescence by the defendants in the bringing of a subsequent State action, compare Restatement (Second) of Judgments § 26(1)(a), nor any mention at the time of a subsequent action.

About four months later, WAG filed the third action. It alleged breach of contract by Baystate with each physician

of WAG, as well as claims of tortious interference and violations of G. L. c. 93A. In broad outline, the complaint in the third action described the same injury which was at the core of the first action and second action, namely that the defendants had frozen the WAG doctors out as anesthesiologists at Baystate. The question is whether the third action resembles the first closely enough to warrant application of res judicata.

There is no dispute that the judgment in the first action, entered with prejudice, is valid and final;[7] it may, therefore, preclude subsequent litigation based on the same claim. *Bradford* v. *Richards*, 11 Mass. App. Ct. at 597. *Fluhr* v. *Allstate Ins. Co.*, 15 Mass. App. Ct. 983, 984 (1983). Restatement (Second) of Judgments § 19. A claim is the same for res judicata purposes if it is derived from the same transaction or series of connected transactions. *Boyd* v. *Jamaica Plain Co-op. Bank*, 7 Mass. App. Ct. 153, 163-164 (1979); Restatement (Second) of Judgments § 24(1). "What factual grouping constitutes a 'transaction', and what groupings constitute a 'series', are to be determined pragmatically." Restatement (Second) of Judgments § 24(2). Whether the facts are related in origin or motivation and whether they form a convenient trial unit are among the considerations. *Ibid.* The underlying policy reason for the bar of former adjudication is that parties and the judiciary should be spared repetitive actions based on the same wrong. Claim preclusion, the category of former adjudication with which we are concerned, recognizes that the same policy applies when a specific rearticulation of the claim (through expression of a new theory of grounds for relief), arising out of the same life situation, could have been, but was not, raised in the prior litigation. See generally Restatement (Second) of Judgments § 24 comments a and b.

Factually, the new ingredient in the third action was that Baystate had actually signed an exclusive agreement with

---

[7]Similarly the judgment in the second action is valid and final, but, because it relegated to Massachusetts courts the adjudication of State claims which might still have life, the res judicata analysis properly focuses on the State actions.

SAS, an event which produced the practical consequence that WAG doctors no longer performed any professional services at Baystate, even though they continued to enjoy clinical privileges there. Having effectively barred the WAG doctors from work at the hospital, Baystate added insult to injury by later stripping the WAG doctors of their clinical privileges because they had not exercised them. Those two acts, however, were merely the culmination of the course of conduct about which WAG had complained in its first action, e.g. (quoting from the complaint), "interfer[]ing with the plaintiffs' clinical privileges to practice anesthesiology with . . . Baystate" and violation by Baystate of "its agreement with the plaintiffs." Those acts occurred some two years before the third action was filed. The principal difference between the first and third actions is that the tenor of the first was that the hospital officers and trustees, Dr. Dinale, and SAS had violated agreements, acted unfairly, and had wrongfully interfered with WAG's contractual relationships in a manner calculated to exclude the WAG physicians from Baystate, while the tenor of the third was that the defendants had achieved, through their unlawful acts, the exclusion of WAG, which had been the defendants' objective right along.

The two complaints dealt with a "natural grouping or common nucleus of operative facts." Restatement (Second) of Judgments § 24 comment b. The same witnesses — the WAG doctors, Dr. Dinale, operating room nurses, hospital officers and trustees — would be the main sources of proof under either complaint. See *ibid.* The facts to be proved had a common quality: Baystate, often because of Dr. Dinale's machinations, made a series of decisions which unfairly restricted the WAG physicians, ultimately caused them to fail, and resulted in their effective ouster. For its part, in each case, the hospital would offer evidence tending to findings that the hospital had engaged in a good faith effort to enhance professional quality in the anesthesia department, that integration reasonably was thought vital, that the WAG physicians had not cooperated with reasonable scheduling re-

quirements, and that the hospital had faithfully complied with such contractual obligations as it had to WAG. See the illustrative cases cited in *Bradford* v. *Richards*, 11 Mass. App. Ct. at 599-600, and see *Blair* v. *Greenville*, 649 F.2d 365, 368 (5th Cir. 1981); *Capraro* v. *Tilcon Gammino, Inc.*, 751 F.2d 56 (1st Cir. 1985); *Catrone* v. *Ogden Suffolk Downs, Inc.*, 683 F. Supp. 302, 310 (D. Mass. 1988).

To the extent that WAG was apprehensive that the umbrella of the first action complaint might not have covered what they sought to prove in light of the events which took place in 1983, it was open to WAG to amend the first complaint. The procedures for doing so are commodious and include amendments to conform the pleadings to the evidence. Mass.R.Civ.P. 15, 365 Mass. 761 (1974). *Loranger Constr. Corp.* v. *E.F. Hauserman Co.*, 376 Mass. 757, 761 (1978). *Guindon Ins. Agency, Inc.* v. *Commercial Union Ins. Co.*, 15 Mass. App. Ct. 931, 932 (1983). *Roche* v. *Roche*, 22 Mass. App. Ct. 306, 311 (1986). Amendment of an existing action is particularly apt when the existing action, as here, asks forward-looking injunctive relief. That sort of action, in its nature, is likely to look to events and facts which develop after the complaint is first filed. *Chief of the Fire Dept. of Lynn* v. *Allard, ante* 128, 131 (1991), and cases cited. *Green* v. *Illinois Dept. of Transp.*, 609 F. Supp. 1021, 1026-1027 (N.D. Ill. 1985). 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4409, at 77 (1981).

In certain contexts, dogmatic insistence on amendment of an existing complaint in preference to dismissal and the bringing of a new complaint might be unduly formalistic or unfair. If the first forum does not have jurisdiction over the rearticulated claim, i.e., the new theory of relief based on the same core claim, it would be unfair to bar a second action as to the rearticulated claim. See Restatement (Second) of Judgments § 25 comment e; § 26(1)(c) comment c.

Such is not the case here. The reader will recall that the first action came on for trial, jury waived, on January 30, 1984. During the lifespans of the first and second actions, an immense amount of discovery had been completed. There

was not, as WAG suggests, difficulty in pouring brand new claims into the empty husk of the first action. The claim was not new or distinct; it was the same claim differently expressed. What was apparently not to WAG's liking was proceeding without a jury. The dismissal of the first action and the bringing of a new one with jury claim involved an effort to secure a forum that WAG thought would be more favorable. It had also taken three years from commencement of the case to come up on the trial list. The defendants were entitled to have the case concluded rather than embracing another three-year (or more) round, with a concomitant period of legal skirmishing. The Superior Court judge rightly concluded that the third action, filed June 4, 1985, was barred by the stipulation under Mass.R.Civ.P. 41(a)(1)(ii), dismissing "all claims" entered five months earlier. Such a stipulation, under Mass.R.Civ.P. 58(a), as amended, 371 Mass. 908 (1977), constitutes a judgment.

2. *The merits.* Our conclusion that the complaint was properly dismissed on grounds of former adjudication is dispositive of the appeal. As we indicated at the outset, however, because the controversy has burned for a decade and the plaintiffs have demonstrated passion and some ingenuity in keeping the case alive, some parenthetical observations about the merits may help to assure that the case has come to its end.

a. *Breach of contract.* WAG's pre-merger (1975) contract with Wesson Memorial Hospital ended December 31, 1977, and was terminable at any time without cause by either party on 180 days' written notice. There was an automatic extender which could be cancelled only by writen notice given 180 days before expiration of the initial term. Baystate gave timely written notice that it did not elect to extend, observing that it appeared prudent to accomplish integration "in a noncontractual atmosphere as it concerns anesthesiology." Thereafter, WAG rendered service at Baystate on a fee-for-service basis, with clinical privileges as described in Baystate's medical staff by-laws.

Clinical (or staff) privileges do not establish the right of a physician to be employed; rather they permit a physician to use hospital facilities and, often, to admit patients. See *Engelstad* v. *Virginia Mun. Hosp.*, 718 F.2d 262, 267 (8th Cir. 1983); Joint Commission on Accreditation of Hospitals, Accreditation Manual for Hospitals 95-96, 99-102 (1982). There is discernible from WAG's complaint in the third action a theory that staff privileges, plus the exercise of those privileges as active anesthesiologists at Baystate by the WAG physicians, added up to an implied contract. If that were so, there would be no purpose for the termination clause which was part of the contract between WAG and the hospital. Exclusive contracts for specialized services to a hospital (e.g., anesthesiology, radiology, pathology) would not, as a practical matter, be possible. WAG's argument fudges the distinction between credentialing (the essence of staff privileges) and calling upon a physician to render professional services. To be sure, the failure to employ the WAG doctors ultimately led to the loss of their privileges because they had no occasion to use their privileges, but loss of privileges for that formal reason carried no imputation of disqualification. To the extent that hospital by-laws have elements of contract, it is that doctors not be stripped of privileges without the process prescribed by the by-laws. See *Jessie* v. *Boynton*, 372 Mass. 293, 303 (1977); *Anne Arundel Gen. Hosp.* v. *O'Brien*, 49 Md. App. 362, 370 (1981). Compare *Rockland Physicians Assocs., P.C.* v. *Grodin*, 616 F. Supp. 958, 961 (S.D.N.Y. 1985). Here the WAG doctors received the formal process due in cases where privileges were lost solely by reason of disuse.[8]

---

[8]The materials on summary judgment contain Baystate's Medical Staff by-laws. Article VII, Part A, § 3, permits considering the frequency with which clinical privileges are exercised as a factor in reappointment recommendations. The record also discloses that the gamut of hearings prescribed in the by-laws was afforded the WAG doctors before the hospital credentials committee and the trustees. The documents disclose that Dr. Dinale, as chief of the department of anesthesiology, and the medical staff executive committee were at pains to avoid any adverse comment on the clinical competence or characters of the WAG physicians, but remarked that as they no longer had an opportunity to observe the WAG doctors in

b. *Wrongful interference with advantageous relations.* As to Baystate, WAG's claim of tortious interference with advantageous relations is subject to the embarrassment that the disrupted relationship was between WAG and Baystate. Baystate cannot be liable for "interference" in its own affairs any more than an employer is liable for tortious interference between itself and an employee. *Appley* v. *Locke*, 396 Mass. 540, 543 (1986), and cases cited. *Schinkel* v. *Maxi-Holding, Inc., ante* 41, 50 (1991). SAS, the other defendant, could work to secure an exclusive contract for itself so long as it did not employ wrongful means. *Doliner* v. *Brown*, 21 Mass. App. Ct. 692, 695 (1986). WAG's complaint is, however, that Dr. Dinale, a member of SAS, used his position as chairman of Baystate's department of anesthesiology to foster administrative policies and to make evaluations which had the cumulative effect of squeezing WAG out. It was surely Dr. Dinale's duty, as chief of anesthesiology at Baystate, and, therefore, his privilege, to express his views about staffing needs, scheduling methods, and administrative structure for his department. See *Laurendeau* v. *Kewaunee Scientific Equip. Corp.*, 17 Mass. App. Ct. 113, 122 & n.12 (1983).

c. *Claims under G. L. c. 93A.* Once again, as to Baystate, the c. 93A claim fizzles because c. 93A does not apply to intra-enterprise disputes. *Manning* v. *Zuckerman*, 388 Mass. 8, 14 (1983). *Riseman* v. *Orion Research Inc.*, 394 Mass. 311, 313 (1985). *Newton* v. *Moffie*, 13 Mass. App. Ct. 462, 467-469 (1982). So far as a c. 93A claim may have been founded on the anticompetitive effect of the exclusive contract between Baystate and SAS, the point was decided adversely to WAG by the decision in *Jefferson Parish Hosp. Dist. No.2* v. *Hyde*, 466 U.S. 2 (1984), as well as by the final judgment in the second action. That leaves only the c. 93A claim against SAS, based on alleged machinations of Dr. Dinale. As to that, we think WAG's cause suffers the same

their professional conduct, they could not make a recommendation one way or the other about renewing their credentials.

handicap discussed in connection with the claim of tortious interference with advantageous relationships.

*Judgment affirmed.*