Kishanlal CHAKRABARTI,
Plaintiff, Appellee,

v.

Joseph L. COHEN, M.D., and Michael J.
Gill, M.D., Defendants, Appellants.

Kishanlal CHAKRABARTI,
Plaintiff, Appellant,

v.

Joseph L. COHEN, M.D., et al.,
Defendants, Appellees.

Nos. 92–1987, 92–1988.

United States Court of Appeals,
First Circuit.

Heard Feb. 8, 1994.

Decided July 22, 1994.

Timothy A. Mullen, Asst. Atty. Gen., Government Bureau, Trial Div., with whom Scott Harshbarger, Atty. Gen., Boston, MA, was on briefs, for defendants.

Robert LeRoux Hernandez, Malden, MA, for plaintiff.

Before SELYA, BOUDIN and STAHL, Circuit Judges.

BOUDIN, Circuit Judge.

Dr. Kishanlal Chakrabarti served as a staff psychiatrist at the Lemuel Shattuck Hospital ("the hospital"), a facility of the Massachusetts Department of Public Health. In this suit he sought redress for his discharge by the hospital, and won a jury award of $75,-000. Both sides appeal. We affirm.

The background facts are straightforward. Born in India and trained in England, Chakrabarti joined the staff of the hospital in 1979 and worked initially in its geriatric psychiatry unit. In the early 1980s, another facility—this one managed by a different state agency—was merged into the hospital. Chakrabarti disagreed with the merger and its implementation and made his criticisms known; and he objected unsuccessfully to the naming of Dr. Michael Gill as head of the combined psychiatric unit at the hospital.

In October 1985 Gill asked Chakrabarti to resign, citing their inability to work together and asserted deficiencies in the latter's performance. Chakrabarti's new immediate supervisor, Dr. Susan Wehry, also expressed some concerns about his performance. Gill repeated his request in December 1985 and Chakrabarti rejected the request. In June 1986 Wehry replaced Chakrabarti in her unit with another doctor, and the hospital's chief of medicine, Dr. Joseph Cohen, assigned Chakrabarti to a newly created job: guardianship coordinator and utilization review physician for psychiatric patients.

. During the next twelve months Chakrabarti did not perform his new duties to the satisfaction of Cohen, Gill or Wehry. Chakrabarti in turn took the view that his new job was effectively a demotion, cutting him off from medical practice with patients at the hospital. On June 5, 1987, Gill gave Chakrabarti a negative evaluation and told him that

if Chakrabarti still declined to resign, Gill would urge the Medical Executive Committee not to renew Chakrabarti's clinical privileges.[1] On June 8, 1987, the Medical Executive Committee voted unanimously not to recommend renewal.

Later in June 1987 Chakrabarti was formally notified of the decision not to renew; the reason given was his failure to perform satisfactorily his current assignment. He was told that he could appeal pursuant to the hospital's medical-staff bylaws. Chakrabarti apparently could not perform his guardianship role without clinical privileges but he was continued on the hospital payroll until June 1988. At that time he was terminated on the ground that no post was available for him at the hospital because he could not perform clinical duties there.

In 1988 Chakrabarti brought the present action in district court, naming as defendants Cohen, Gill and several others who are no longer parties to the case. The complaint set forth five counts: a section 1983 claim under federal law, 42 U.S.C. § 1983 (count I); a claim under the Massachusetts Civil Rights Act, Mass.Gen.L. ch. 12, §§ 11H, 11I (count II); and state common law claims for intentional infliction of emotional distress (count III), interference with business relations (count IV), and defamation (count V). Damages and reinstatement were both sought.

The first trial occurred in November 1991. The court directed a verdict for defendants on count III. Thereafter the jury found in favor of Cohen and Gill on counts I, II and V. On count IV the jury found in favor of Chakrabarti and awarded him $1 in nominal damages and $30,000 in punitive damages. In answer to interrogatories, the jury said that Cohen and Gill had not sought to retaliate against Chakrabarti for constitutionally protected speech.

In January 1992 the district court resumed proceedings to consider equitable relief. The following month, the court allowed Chakrabarti to amend his complaint to allege—as count VI—violations of substantive due process and procedural due process; these were to be considered as bases for equitable relief on the existing record. The court also ordered a new jury trial on damages under count IV because it concluded that punitive damages were not permitted under Massachusetts law on count IV. A retrial on count IV occurred in March 1992, and the jury awarded Chakrabarti $75,000 in actual damages against Cohen and Gill.

Thereafter the district court resolved the claims for equitable relief. It first found that the substantive due process claim failed on the merits. Later the court rejected the procedural due process claim; the court said Chakrabarti had been terminated prematurely because Cohen and Gill failed to follow required procedures, but the state provided an adequate appeal process that Chakrabarti had failed to follow. Finally, as to count IV the court found that equitable relief was barred by the *Pennhurst* doctrine, *see Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). It also ruled that under state law attorney's fees were not available as to count IV.

On June 26, 1993, judgment in favor of Chakrabarti and against Cohen and Gill was entered on count IV in the amount of $75,000 plus $33,351.45 in pre-judgment interest, plus costs. Judgment was entered in favor of the defendants on all other counts. Represented by the state, Cohen and Gill appeal from the judgment on count IV. Chakrabarti appeals from the judgment on counts III and VI and the refusal to allow attorney's fees as damages under count IV.

◼ We start with the appeal by Cohen and Gill. Although limited to count IV, this appeal raises several distinct issues. Defendants begin by asserting that on this record no reasonable jury could have found that the defendants had unlawfully interfered with an advantageous business relationship, and a verdict should have been directed on this count. On appeal, we draw all reasonable inferences in favor of the party who opposed the directed verdict and prevailed at trial;

1. Under the by-laws clinical privileges were reexamined every two years by the Medical Executive Committee on which Cohen sat. Its recommendation could be appealed to the Public Health Council headed by the State Commissioner of Public Health.

and credibility issues are similarly resolved in favor of the jury verdict. *Santiago–Negron v. Castro–Davila*, 865 F.2d 431, 445 (1st Cir.1989).

Both sides agree that the elements of the count IV claim under Massachusetts law are a business relationship with a third party, knowledge of it by the defendants, interference "through improper motives or ... means," and harm.[2] The defendants say that under state law they enjoyed the benefit of statutory privileges that protect them so long as they acted in good faith and in the reasonable belief that their actions were proper. *See* Mass.Gen.L. ch. 231, § 85N; Mass. Gen.L. ch. 111, § 203(c). And, say the defendants, Chakrabarti's central argument is that he was fired in retaliation for his criticism but this claim is negated by the jury's interrogatory answers on this issue.[3]

We will assume *arguendo* that the interrogatory answers established that Cohen and Gill did not retaliate against protected speech. This may mean a debatable assumption; one might argue that inconsistency in civil verdicts on different counts is permissible or, at best, grounds for contemporaneous relief (*e.g.*, further consideration by the jury before entry of the verdicts). But even if retaliation for protected speech were disregarded as a possible motive, defendants must still show that nothing else in the record supported a finding of bad faith or unreasonable belief. Defendants' brief does not attempt the task.

At trial Chakrabarti sought to show that he had enjoyed good evaluations prior to Gill's arrival; that Gill, with Cohen's acquiescence and Wehry's support, had set about building a false record of Chakrabarti's incompetence; that improper threats had been employed by Gill; that Cohen had assigned Chakrabarti to a dead-end job with no guidance or help as a pretext for forcing him out of the hospital; that defendants ignored pro-

cedures that governed removal; and that others on the staff had been outraged at what they said was unfair treatment of Chakrabarti. In short, Chakrabarti's criticism of the new merger and of Gill was only a part of the story.

Whether the story has much basis may be debatable, but it is the job of an appellate brief to muster and array the evidence to show why no reasonable jury could find bad faith or other misconduct. Here the defendants' brief on appeal makes no serious effort, in support of this ground of appeal, to analyze the evidence taking it in the light most favorable to Chakrabarti and resolving credibility issues in his favor. It is not our job to comb a seven-volume trial transcript afresh and without counsel's assistance, and we decline to do so. *Cf. U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 599 (1st Cir.1993).

Although it weakens Chakrabarti's case to assume away the main motive he argued to the jury—supposed retaliation against protected speech—it does not eliminate that case. Fabricating false claims of incompetence could easily serve as wrongdoing under count IV even if one assumed that Gill acted out of personal dislike and Cohen and Weary out of loyalty to Gill. The original punitive damage award suggests that the jury may well have taken such a view of the matter. Quite possibly the jury was wrong. But it is the job of defendants' counsel to show us why and counsel has not made the effort.

■ Later in their brief defendants make a different kind of argument against liability. They say that as a matter of law administrators of the hospital cannot be liable for interference with an advantageous relationship between the hospital and one of its own employees. This certainly could be the law and perhaps ought to be; but the general

---

2. *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 551 N.E.2d 20, 23 (1990); *see also G.S. Enters. v. Falmouth Marine*, 410 Mass. 262, 571 N.E.2d 1363, 1370 (1991). Traditionally, the remedy differs in certain aspects, depending on whether an existing contract or merely a business relationship is disarranged; but these differences have not been stressed in this case.

3. As noted, the jury found in response to interrogatories under Fed.R.Civ.P. 49 that Chakrabarti's "protected speech" was not "a substantial or motivating factor" in the actions taken against him by Cohen and Gill.

rule is that supervisor status, or co-employment, merely creates a privilege for good-faith interference through reasonable means. *See* P. Keeton, *Prosser and Keeton on Torts* 985 (5th ed. 1984) (citing cases).

Defendants cite only a single case to show that Massachusetts follows a different course. *Saint Louis v. Baystate Medical Ctr.*, 30 Mass.App.Ct. 393, 568 N.E.2d 1181 (1991). That case confirms that, as one might expect, an *employer* cannot be sued by its own employee for interfering with the contract between them. *Id.* 568 N.E.2d at 1188. But the case does not say that a supervisor is similarly exempt from suit; it merely says that the supervisor enjoys a privilege to express his views. *Id.* Nothing in the discussion, or in the underlying facts described in the opinion, suggests that this privilege is absolute or shields an improper motive or improper means. *Accord, Wright v. Shriners Hospital,* 412 Mass. 469, 589 N.E.2d 1241, 1246 (1992).

Turning to damages, defendants make several arguments. They first point to the directed verdict for defendants entered by the district judge on count III; they note that Chakrabarti did not claim pecuniary damages (he appears to have earned more in private practice after leaving the hospital); and they say that the emotional distress claimed as damages under count IV represent the same damages that the judge declined to permit under count III. The short answer to the supposed inconsistency is that the district judge dismissed count III because he thought that outrageous conduct had not been shown. Thus the dismissal had nothing to do with a lack of emotional distress.

■ Defendants also say that one who sues for wrongful interference with an advantageous relationship may not collect compensatory damages for emotional trauma but only for pecuniary loss. This argument has some surface appeal since the wrongful inter-ference tort is directed to protecting economic relationships, *see* Keeton, *supra*, at 978, and Massachusetts has a separately defined tort to protect against emotional distress. But defendants did not make this argument to the district court, and we cannot say that it was "plain error" for the district court to allow such damages where the relationship in question was an economic one.[4]

■ Defendants' last claim on damages is that the first jury verdict showed that no actual damages were suffered and that the district court should simply have set aside the punitive damages award without granting a new trial. In one of several versions of this argument, defendants contend that the jury's finding of no actual damages was untainted by the misinstruction allowing punitive damages. Chakrabarti, say the defendants, should not benefit from an error in instructions that he himself invited.

Based on his remarks, the district judge evidently believed that the jury had, under the mistaken instruction, accepted the evidence of emotional distress but compensated for it in the punitive damages award. The judge thought that fairness required a fresh start on damages, and he noted that neither side had properly advised him on the no-punitive damages rule. A new trial on damages was arguably the right course and was certainly not an abuse of the trial court's broad discretion to order new trials. *See* Fed.R.Civ.P. 59(a); *Dopp v. HTP Corp.,* 947 F.2d 506, 518 (1st Cir.1991).

■ We turn now to the cross-appeal by Chakrabarti. His first argument is that the district court erred in directing a verdict against him on his count III claim of intentional infliction of emotional distress. Massachusetts law recognizes such a tort to redress "extreme and outrageous conduct." *Agis v. Howard Johnson Co.,* 371 Mass. 140, 355 N.E.2d 315, 318 (1976). The district court thought that no reasonable jury could find that the defendants' conduct rose to that

---

4. *Compare American Velodur Metal, Inc. v. Schinabeck,* 20 Mass.App.Ct. 460, 481 N.E.2d 209, 216 (1985) (compensation for mental distress and anxiety allowed), *cert. denied,* 475 U.S. 1018, 106 S.Ct. 1204, 89 L.Ed.2d 318 (1986), with *Ratner v. Noble,* 35 Mass.App.Ct. 137, 617 N.E.2d 649 (1993) (no such compensation allowed where the relationship interfered with was a non-pecuniary one). *See* Keeton, *supra,* at 1003, n. 68, listing Massachusetts as one of the states that allows recovery "for mental suffering" for tortious interference.

level. We share that view and therefore bypass the question whether count III could have afforded Chakrabarti any further damages not covered by the count IV award.

Chakrabarti's brief portrays the case as one in which "an exemplary public servant" and "inspiring leader" was hounded out of his job through insults, lies and calculated humiliations. In fact, the record shows not another Dreyfus affair but a fairly common employment dispute etched not in black and white but in gray. Chakrabarti, whose own past evaluations were reasonably good but not flawless, resisted the new regime; the working relationship deteriorated; he was shifted to a less attractive job and further disputes ensued; ultimately, he was terminated, despite the protests of a number of those with whom he had worked.

In obtaining this termination, the defendants may have misstated facts concerning Chakrabarti's competence and conduct, although his brief offers more generalizations than record citations on this point. The administrators, who after all had gone to medical school rather than law school, may also have made some procedural missteps, as the district court found.[5] Perhaps it was not an impermissible stretch for a jury to find their conduct unprivileged (although as noted the evidence on this issue has not been seriously sifted by defendants). But there is no indication that any of their conduct, or all of it taken together, was extreme and outrageous.

■ Life is crowded with events that cause emotional upset and turmoil. As one would expect, the cases indicate that Massachusetts law keeps a reasonably tight rein on the tort remedy for intentional infliction of emotional distress. The courts' language, although general, includes phrases like "beyond all possible bounds of decency," "utterly intolerable in a civilized community," and "atrocious." *See, e.g., Foley v. Polaroid Corp.*, 400 Mass. 82, 508 N.E.2d 72, 82 (1987); *Short v. Town of Burlington*, 11 Mass.App. Ct. 909, 414 N.E.2d 1035, 1036 (1980). Lawyers, who use the term "outrage" liberally,

may become tone-deaf to the nuances; but an atrocity is something more than a faulty evaluation, a procedural error in applying opaque credentials rules, or even a dead-end job as competency coordinator.

This discussion also answers Chakrabarti's next claim of error. The district court ruled, on count VI, that there was no violation of substantive due process, a label normally reserved for conduct that is truly shocking. *See Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (use of stomach pump to retrieve evidence). One need not be blind to Chakrabarti's undoubted distress to appreciate that defendants' conduct fell far short of the "egregiously unacceptable, outrageous, or conscience-shocking." *Amsden v. Moran*, 904 F.2d 748, 754 (1st Cir.1990), *cert. denied*, 498 U.S. 1041, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991).

As his third claim of error, Chakrabarti asserts that the district court erred in failing to find a violation of procedural due process. The district court said that Chakrabarti's privileges had been terminated prematurely (see note 5, above), but that no improper state action was implicated. The court reasoned that the fault lay not in the by-laws but in defendants' mistaken treatment of the committee's action as final. Citing *Lowe v. Scott*, 959 F.2d 323 (1st Cir.1992), the court called this a random and unauthorized action by individuals and not a basis for relief against the state.

■ On appeal, Chakrabarti's brief points to a different possible defect in the by-laws and insists that under section 1983 he is entitled to an injunction reinstating his clinical privileges (and presumably to attorney's fees as provided where relief is obtained under that section). The supposed defect, created by obscure wording in the by-laws, is the possibility that hospital administrators could frustrate an appeal from an adverse committee action by having the chief of the applicant's service unilaterally withdraw the

---

5. The principal misstep described by the district court was the termination of Chakrabarti's medical privileges based on the action of the Medical Executive Committee. As the district judge read

the by-laws, that body merely makes recommendations to the Public Health Council, which in this case apparently did not act.

disapproved application.[6] This, Chakrabarti argues at length, is a wholly foreseeable threat to due process.

There is no evidence that any such pocket veto was used to frustrate an appeal here. Rather, Chakrabarti was specifically and promptly advised of his right to appeal the adverse recommendation of the Medical Executive Committee. He took no action to pursue that right. It is unclear that the by-law creates such a pocket veto—the language may envision a withdrawal, with the applicant's consent, to avoid further embarrassment—but in any event the potential defect caused no harm in this case.

■ The last issue in the case concerns attorney's fees under count IV. At the second jury trial, Chakrabarti sought to offer evidence of attorney's fees as part of his damages claimed for tortious interference by defendants. Recognizing that attorney's fees are not normally compensable damages in common law actions, Chakrabarti's counsel cited to the court an exception recognized in Massachusetts in tortious interference cases where the victim is forced "to sue. . . . a third party in order to protect his rights." *M.F. Roach Co. v. Town of Provincetown*, 355 Mass. 731, 247 N.E.2d 377, 378 (1969).

The district court rejected the evidence, saying that, by contrast to *Roach*, the present case did not involve attorney's fees incurred in suing a third party to restore contractual rights; rather the fees were incurred in the present suit to recover against the alleged tortfeasors themselves. *Roach* is a very brief opinion, little illuminated by later cases. But its language and what can be discerned of its rationale give no hint that *Roach* applies to legal fees incurred in suing the tortfeasor.

Rather imaginatively, Chakrabarti's brief on appeal tries to analogize this case to a suit against the hospital *in proper persona* for reinstatement: the brief asserts that, so far as equitable relief is concerned, the request for reinstatement is made against the doctors in their *official* capacity, just as if the hospital had been joined as a defendant. This analogy is not without some force, although it may not have been clearly presented to the district court.

In any case, reinstatement was *not* granted to Chakrabarti in this case or, so far as we know, in any other. In *Roach* the attorney's fees allowed were incurred to achieve redress against the third party. Here, no such reinstatement has been achieved and, in view of Chakrabarti's failure to appeal the action of the Medical Executive Committee, such relief was always unlikely. We have no warrant to extend *Roach* to such a situation where redress against the third party is not achieved or even likely, unless and until the Massachusetts courts choose so to extend it. *See, e.g., Pearson v. John Hancock Mut. Life Ins. Co.,* 979 F.2d 254, 259 (1st Cir.1992).

This case reveals the limitations of the trial process, which imposes yes or no answers on liability questions, in coping with muddled disputes of this kind. Frankly, it is not manifestly clear to us that Chakrabarti deserved to lose his clinical privileges, nor that Cohen and Gill acted in bad faith or through patently improper means. But the parties chose to litigate the case rather than to settle, as the district judge wisely encouraged them to do, and we find no legal error affecting substantial rights in the proceedings, nor any basis to overturn the jury's decision.

*Affirmed.*

---

**6.** Section 6.5–5(c) of the bylaws reads:
*Adverse Recommendation:* When the recommendation of the MEC is adverse to the applicant, the superintendent shall immediately request the chief of services to resubmit a revised application within 10 days or to withdraw the original application.