VOLTERRA, J.
INTRODUCTION
This is an amended memorandum of decision to correct certain typographical errors which this court corrects after notice by counsel for the plaintiff. Plaintiff, Linkage Corporation (Linkage), sued defendant, Boston University (BU), on various claims arising out of a contract dispute. The case was tried to a jury which returned a verdict against Boston University. Boston University now moves for a new trial on Linkage’s G.L.c. 93A claim. Boston University’s motion for a new trial is DENIED because the court, in its discretion, opts to treat the jury’s c. 93A verdict as advisory.
Accordingly, the court chooses to issue its own findings of fact, rulings of law and order for judgment on plaintiffs c 93A claim. In sum, the court finds that Boston University knowingly violated c. 93A by (1) inducing Linkage to rely on Boston University’s promise to enter into a new contract; (2) intentionally interfering in Linkage’s relations with its employees; and (3) defaming Linkage and its principals.
Accordingly, the court awards Linkage $2,053,634 in c. 93A damages and $899,841.04 in attorneys fees and costs.
RELEVANT BACKGROUND
In its complaint, plaintiff alleged, among other claims, violations of G.L.c. 93A, §11. During jury selection, the court stated that “the jury [will] decide the 93A claim . . . The 93A case is going to be tried to the jury.” Transcript, p. 195-96.
The jury returned a verdict against the defendant on the c. 93A claim. Defendant, asserting that the court improperly instructed the jury as to the burden of proof on the element of trade or commerce, moved for a new trial on the c. 93A claim.
DISCUSSION
There is no right to a jury trial for a claim under G.L.c. 93A. Neiv. Burley, 388 Mass. 307,315 (1983). Itis-within the judges’s discretion, however, to submit a c. 93A claim to the jury. Travis v. McDonald, 397 Mass. 230, 234 (1986); Service Publications Inc. v. Goverman, 396 Mass. 567, 577-78 (1986); Mass.RCiv.P. 39(c).
Where common law claims triable to a jury are joined with a c. 93A claim, the judge has the choice of (1) letting the jury find facts on all the claims, (2) reserving to himself all aspects of a 93A claim, or (3) asking the jury for a nonbinding advisory opinion as to whether the defendant acted unfairly or deceptively. Acushnet Fed. Credit Union v. Roderick, 26 Mass.App.Ct. 604, 606 (1988); Chamberlayne School v. Banker, 30 Mass.App.Ct. 346, 354 (1991).
In this case, the court’s statements that “the jury [will] decide the 93A claim,” did not specify whether the jury’s decision would be binding or advisory. The court chooses to treat the jury decision as advisory and issue its own findings in order to avoid a new trial should the instruction on burden of proof be in error. Cf. Int’l Totalizing Systems, Inc. v. Pepsico, Inc., 29 Mass.App.Ct. 424, 436 (1990). Moreover, by submitting proposed findings and rulings to the court, the parties have waived any claim that the jury decision be binding. See Mass.R.Civ.P. 39, Reporter’s Notes. *538 Accordingly, Boston University’s motion for a new trial is DENIED, and I make the following factual findings.
FINDINGS OF FACT
Boston University is a charitable corporation organized under the provisions of G.L.c. 180. In 1987, BU agreed to acquire the Wang Institute, a facility located in Tyngsborough, Massachusetts. In order to obtain title to the land, buildings and personal properly of the Wang Institute, BU agreed to assume all of the Wang Institute’s liabilities, including a large debt service. BU has converted this indebtedness by becoming the obligor on bonds issued by the Massachusetts Health and Educational Facilities Authority (MHEFA).[1] At the same time An Wang made a gift of two and a half million dollars to BU. Once the transfer of the Wang Center to Boston University was completed BU renamed the Wang Center facility the Boston University Corporate Education Center (CEC).
BU claims that in its operation of an entity known as the Boston University Corporate Education Center it is exempt from taxation pursuant to Section 501(c)(3) of the Internal Revenue Code and from taxation under the revenue laws of the Commonwealth of Massachusetts. BU further claims that, as a nonprofit educational institution, it was entitled to reduced postal charges for CEC mailings. BU’s reliance on its status as a non-profit corporation is an important element in understanding the genesis of the breach of contract which ruptured the relationship between Linkage Corporation and BU.
In 1988, it came to the attention of responsible officials at Boston University that BU was experiencing large financial losses in operating the CEC. In the fiscal year prior to Linkage managing the facility, BU experienced a $950,000 loss. Boston University wanted to turn the situation around by establishing a substantial stream of revenue at the Boston University Education Center to offset the large debt service and other overhead costs which this facility was plagued by-
At this time, Philip J. Harkins (Harkins), the future principal and CEO of the plaintiff Linkage, was employed as a vice president at Keene, Inc. (Keene). At Keene, Harkins was principally engaged in the development of educational programs aimed at training corporate employees in automation technology skills. Price, the dean of BU’s Metropolitan College,[2] contacted Harkins for the purpose of establishing a program at Metropolitan College to train people to become computer programmers after they had lost their jobs due to “downsizing.”
Price’s idea was to propose such a program to the Commonwealth’s Division of Employment Security. Metropolitan College planned to charge the tuition costs to the state agency, who it was foreseen would be desirous of reducing the number of persons on the unemployment rolls. The program would additionally serve to improve the Massachusetts business climate by having available a large pool of trained programmers for the high technology sector of Massachusetts industry. At the time that the Price-Harkins contacts were taking place, Keene was involved as a “for-profit” trainer of computer programmers, and Harkins was skilled in setting up and running automation technology training courses.
Harkins, through his contacts with Dean Price met BU Vice President for External Programs, J. Joseph Meng (Meng). Dean Price, as Dean of Metropolitan College, reported to Meng under BU’s administrative hierarchy. Meng was closely associated with, and a personal friend of, BU president John Silber. Indeed, as late as November 1990, Meng and his wife vacationed in Grenada with President Silber and his wife. Meng, a food and wine connoisseur, helped President Silber select vintage wines for his wine cellar. It was Meng’s responsibility, among his other duties, to directly supervise the affairs of the former Wang Center and Metropolitan College.
Meng, a graduate of Catholic University and the Columbia Law School, is an experienced academic administrator. He taught law at the Catholic University of Puerto Rico, and began his administrative career by becoming Assistant to the President of the Catholic University of Puerto Rico. Meng was the Dean of Students and Vice Chancellor for ten years at City College of New York (CCNY). He was the President of the Culinary Institute of America and then held an administrative post at Antioch Law School before coming to Boston University as Vice-President for Labor Relations.
Meng was given major responsibility by Boston University in 1984 when he was promoted to Vice-President for External Affairs. He was in that position until 1991 when he resigned his position because of President Silber’s actions in terminating the Linkage contract. His resignation, as will be seen by the findings which follow, was an action of courage and integrity which is seldom demonstrated today. Moreover, his resignation led to his wife resigning her important post as BU’s Vice-President of Alumni Affairs, the loss of free tuition for his two sons and the curtailment of other perquisites.
Dean Price wanted Harkins to work for BU and set up an expanded program to train computer programmers at the CEC in Tyngsborough. Harkins, on his part, wanted to create his own company to train corporate personnel and others in automation technology. Harkins’ concept was to forge a “link” between the corporate and academic worlds for the purpose of marketing his concept of training in automation technology to corporate employees displaced from employment by corporate “downsizing” or mergers and acquisitions. Harkins conceptualized that the displaced employees could be re-trained for employment in high technology industries. This “link” concept led Harkins to name his company, Linkage Corporation.
*539 Harkins declined to work for the university, instead he offered his services through the “for-profit” corporation he had conceptualized. This in turn led through the summer of 1988 to extensive negotiations between Meng, on BU’s behalf, and Harkins, on behalf of Linkage, to have Linkage operate the Wang Center in Tyngsborough for BU. On July 29, 1988, Harkins formally incorporated Linkage as a Massachusetts “for-profit” corporation.
During the course of the negotiations, Meng reported to the BU board of trustees that it was not expected that the new facility at Tyngsborough, which was now to be called the Boston University Corporate Education Center (BUCEC), would turn a profit for at least three years, and perhaps for as long as five years. President Silber was aware and understood, that it would take the entire contract term of three years, and perhaps a longer period of time, to turn the situation around at the Wang Center.
In the BU hierarchy, Meng ostensibly reported to the Provost, Dennis Berkey. In respect to any major undertaking, Meng was also required to receive ultimate approval from BU’s Executive Vice President, Jon Westling. This hierarchical structure would make sense in a university setting where the provost generally deals with academic problems, and a person such as Westling would deal with financial, building and grounds, security, and asset management problems. In reality, the BU management picture was much more flexible. If the case was in classical times that all roads led to Rome, at BU everything led to Silber.
Meng, as a friend and confidant of Silber, did not need authority from anyone to bind BU in agreements with third parties dealing with Metropolitan College, Boston University Educational Center, or other external programs he was responsible for. Meng dealt directly with Silber, Berkey and Westling by simply running things by them. Meng executed contracts for BU. His contractual authority was continually ratified by the university through the acts of Silber, Berkey and Westling. Indeed, Westling abandoned any pretense of adhering to some chain of authority. Instead, he gave Meng free rein and trusted him completely. Westling’s supervision was limited to reading and routinely approving memoranda forwarded to him by Meng. Westling’s testimony makes clear that he had confidence in Meng and that to the end he believed that Linkage’s performance in running BUCEC was superlative. Westling had such complete faith in Meng’s and Harkins’ running of BUCEC that he paid little attention to any details about the Tyngsborough operation, except to keep an eye on the bottom line.
On July 15, 1988, and again on July 22, 1988, Meng submitted a memoranda to Westling which contained the important points of the proposed Linkage-BU contract for the operation of the Boston University Corporate Education Center. Meng was very enthusiastic about the proposal he had put together with Harkins. Meng informed Westling that although he did not want to oversell the Linkage proposal he wanted to emphasize that he was making a very strong case that BU enter into the agreement.
Dennis Hart, Esq., BU’s associate general counsel, prepared the drafts of the proposed contract. The drafts reflected, in general, the oral negotiations that were being conducted between Meng and Harkins. Meng, in addition to conferring "with Hart, also met with Silber and Westling. Although Meng consulted with his superiors at BU, Meng was essentially given carte blanche authority to put the deal through with Harkins. Harkins reasonably was under the impression that Meng possessed actual authority to bind BU to the deal. Indeed, Harkins was not informed by Dennis Hart or any other responsible BU official that Meng lacked authority to negotiate and bind BU to the deal. Meng did inform Harkins that he was discussing the contract "with senior BU officials in order to obtain the necessary verbal approvals to finalize the agreement. During the course of these negotiations Meng brought Harkins to meet Jon Westling and Dennis Berkey at the University’s administrative offices. At this meeting Harkins discussed his academic and professional experience with the BU officials. Harkins assumed that he had been brought to BU by Meng for the purpose of briefing Westling and Berkey on his plans for making the Tyngsborough center profitable. At no time during the meeting did Meng, Berkey or Westling indicate that it was necessary to obtain the approval of these men or of President Silber before the contract could go into effect. Indeed, during the entire discussions which took place between these men no aspect or detail of the contract which was slated to be executed was raised by any party present.
On August 1, 1988, Meng acting for BU, and cloaked with authority by his superiors, executed the Linkage-BU contract with Harkins. In this agreement Linkage agreed to provide services for BU at the Wang Center in Tyngsborough. It was at this time that the Wang Center, which had been re-named the Boston University Education Center by BU, was again renamed at Harkins’ suggestion to be known in the future as the Boston University Corporate Education Center. A hallmark of the degree of Meng’s involvement in this agreement was that BU’s general counsel’s office, when they drafted the contract, named Meng as the proper party to accept legal notices on BU’s behalf.
The contract executed between BU and Linkage on August 1, 1988 has been designated by the litigating parties as the Base Agreement.
The contract contained an important provision that both BU and Linkage were prohibited from hiring each other’s employees until one year after the contract expired or for one year after the contract was for any reason terminated. Harkins, who was very interested in building his own, strong and successful company, insisted on this provision.
*540 The Base Agreement was for three years. It was to terminate on August 1, 1991. The Base Agreement called for BU to employ Linkage to manage and market educational programs and services on BU’s behalf out of the former Wang Center. The programs and training seminars were to meet the goals and standards of the university. The agreement provided that it could not be modified, amended or any provision waived unless made in writing and signed by each contracting party.
The Base Agreement provided that proprietary data such as customer lists and trade secrets were to remain BU’s property. Moreover, such proprietary materials were to be surrendered by Linkage to BU at the completion of the contract term.
The Base Agreement reserved to BU the ultimate control over the activities at BUCEC, including the granting of final approval of all courses, programs, seminars, and the employment of instructors and other teaching staff. Additionally, Linkage agreed to only use BU’s name and logo in promotional and marketing material when authorized by the university. President Silber, Executive Vice-President Westling and Provost Berkey never exercised any supervisory or review function over Linkage. Meng was the only BU executive officer to have any real interest in the management of BUCEC until the fateful, late summer of 1991 when President Silber was determined to terminate Linkage’s relationship with BU. Meng was the only senior BU official to involve himself with the affairs of BUCEC and Linkage. Silber’s, Westling’s and Berkey’s interest in BUCEC did not extend past the communications and reports made to them by Meng. Meng on the other hand kept a very close eye on Linkage’s operation and management of BUCEC.
The Base Agreement provided that BU had the option to terminate the contract for cause, immediately upon notice to Linkage, upon the occurrence of any material breach of the terms of the contract.
At the moment that the Base Agreement was executed, Linkage had no equipment, employees, supplies or offices. Linkage consisted only of the concept devised by Harkins, and accepted by the university, that Harkins could build a corporate organization operating out of the former Wang Center to generate large cash flows for BU so that BU could carry the debt service and other overhead expenses which surrounded BU’s acquisition of the Wang Center. Essentially, BU wanted to turn the Wang Center from an albatross into a golden goose.
Linkage began to run BUCEC on August 1, 1988. Linkage’s contract with BU had the compensation to be earned by Linkage pegged to gross revenues. BU’s intent with the BUCEC operation was to maximize the cash flow earned at both the BUCEC facility and at seminars and conferences held off the Tyngsborough site. Linkage was highly successful at generating revenues for BU through its programs. During the three years that the Base Agreement was in effect Linkage exceeded its projected revenue targets yearly. Thus, pursuant to the contract, Linkage earned a bonus payment from BU for each of the three years of the Base Agreement. The gross revenue generated in fiscal year 1988 was approximately $976,776.00. In fiscal 1989 the gross revenue was approximately $2,844,000.00; and, in 1990 the gross revenue for that fiscal year was approximately $6,252,000.00. Indeed, BU was so pleased with Linkage’s earning performance that Executive Vice-President Jon Westling once referred to Linkage as a “cash cow!”
Linkage developed its own training programs which were conducted at BUCEC and it also ran and conducted seminars and training conferences both at BUCEC and off site. BU, on its own part, transferred a few university courses from its schools to the BUCEC site which Harkins then managed under the Linkage rubric. Linkage’s courses, conferences and seminars were concentrated in the computer technology fields. Linkage, with BU’s blessing, aimed its marketing goals and strategy at the corporate world. Harkins ran what was a David Mamet, Glengarry-Glenross sales operation, which hustled the corporate dollar. Little or no attention was paid to matriculating students whose objective was earning a degree. Linkage, again with BU’s blessing, was in the skills business. It was vocational rather than educational. A participant at Linkage classes, seminars and conferences was there to hone his or her technical proficiency. Linkage was not in existence to advance its participants intellectually in the usual and normal academic sense. Linkage and BUCEC were in business to advance their individual customer’s careers by improving upon their employ-ability and to advance their corporate customer’s labor force’s productivity.
The basic raison d’etre of computer work stations, networks and systems is to improve productivity. Computers are not designed to improve thinking or to displace the brain. At the very highest end of application, these machines, and the employee programmers, technicians and managers who run them may deal with artificial intelligence and robotics but they do not deal with the intellectual, artistic, cultural, social, ethical and scientific advancement of humankind which is the business of colleges and universities.
Boston University, at its main campus, particularly with its Metropolitan College division does offer some courses in computer applications. The College of Liberal Arts has a Computer Science Department, and BU’s College of Engineering does offer courses in computer science. Boston University does teach its students computer operating systems and programming languages such as DOS, UNIX, C++ and C. Boston University’s School of Management does offer courses leading to a degree in Business Administration. The focus of the University’s Boston campus is on the matriculating student seeking a degree. The fact that Metropolitan College offers a few non-credit *541 courses to interested persons who seek personal improvement or the fact that some similarity existed between a few courses offered by the lyngsborough BUCEC facility operated by Linkage’s Professional Development Seminars (PDS Programs or PDS) and courses which duplicated or replaced courses offered at the main campus by Metropolitan College does not change the basic academic posture of the centralized BU campus along Boston’s Commonwealth Avenue, and it does not change the basic commercial character of BUCEC. Indeed, as BU admitted judicially, the postal service at an adversary hearing ruled that the operation was commercial.
The inescapable conclusion from the totality of the evidence is that in contradistinction to the academic mission of the BU schools and colleges at the main campus, Linkage’s operation of BUCEC at the lyngsborough campus, and elsewhere nationally and internationally was entirely commercial in character. The sole basis that Boston University entered and maintained its contractual relationship with Linkage was to engage in trade and commerce by having BU expand its reach beyond its individual student base to the corporate market. The corporate market provided a much more lucrative earnings potential than an individual matriculating student would.
The BU-Linkage relationship was a business deal between two separate corporate entities that wished to advance their own separate commercial advantages by entering the corporate market. Boston University-needed Linkage to manage and operate the' BUCEC facility. It was a straight management contract which was no more complex than a college or university hiring another coiporation to run its food service department. The kitchen and dining room remains the property of the university. The food service company then hires the managers, cooks, food service personnel and custodial persons needed to run and operate the facility. In this case BU retained title to the BUCEC facility and its classrooms, dining facilities, and equipment. Linkage then came in under its contract to manage and operate the facility. It was in a sense BU’s privatization of the BUCEC facility. Under BU’s management the lyngsborough campus had been losing money. Under Linkage’s management BUCEC became profitable. The contractual agreement between these two corporations was not intra-enterprise, rather it was in trade and commerce.
In February of 1990, BU Vice-President Meng negotiated with Harkins an additional and supplemental contract between the parties. Boston University wanted Linkage to manage and operate certain so-called PDS seminars which had been an effort of BU’s Metropolitan College to enter the corporate market. This contract was designated by the parties as the Metropolitan College Contract or Met College Contract. The contract was also known as the PDS contract; PDS being the acronym for Professional Development Seminars. The contract did not expose BU to any financial risk as Linkage was required to pay all expenses and pay BU a 9.15% commission on all gross revenues earned by the seminars. Each party could terminate the contract upon six months written notice. Meng represented BU in the negotiations. Meng and Harkins were the exclusive representatives of the parties to the agreement but the contract was executed by BU’s Assistant Treasurer Ken Congdon. I find that Congdon merely ministerially approved what Meng and Harkins had bound their entities to. I infer that the contract in final form was drafted by BU’s Office of General Counsel. This contractual agreement demonstrates that Linkage was a completely separate entity from BU, that the relationship between these parties was not intra-enterprise, and that Meng possessed the power to bind BU to agreements with third-party contractors.
Harkins and Meng met frequently. Harkins sent Linkage monthly reports to Meng at BU. John Tripp, a financial analyst employed by BU, regularly examined BUCEC’s financial records. Meng assigned two BU employees with fiscal experience to oversee Linkage’s financial operations at BUCEC. The two employees, Christine Rao and Ellen Rosenberg, were directly supervised by Phillip Harkins, but reported to Meng and Meng’s fiscal people at BU. Rao and Rosenberg remained BU employees and were paid by BU. This gave Meng and BU ample fiscal oversight over Linkage’s financial affairs. Through Meng, BU’s fiscal people at the main campus were cognizant of every nickel being earned and of every nickel being spent by Linkage’s operation of BUCEC. There was no doubt among BU’s fiscal managers in respect to the profitability and margins of the programs being run at BUCEC by Harkins. Boston University’s claims to the contraiy are false and pretextual.
Meng was pleased with the progress that Linkage had made at BUCEC and he reported Linkage’s success to his superiors at Boston University. Meng was aware and had approved Linkage’s expansion of its conference business. Meng was also aware and had approved of Linkage’s development of corporate partnership in its marketing efforts with BUCEC. Meng also knew and approved of Linkage’s first planned national expansion of its FPDP program to Chicago.
In November, 1990, Meng informed President Silber that he had begun negotiating the BUCEC renewal contract with Linkage. Silber was pleased, stating “That’s good. That was a real good deal.” From November 1990 to March 1991, Meng informed senior BU officials that he was negotiating the renewal of the BUCEC Base Agreement agreement with Linkage. As of March 1991, Meng, on behalf of BU, and Harkins, representing Linkage, had agreed to all the material terms and conditions of the renewal contract. Harkins and Meng had agreed that the Base Agreement would now incorporate the Met College contract and some *542 additional duties which would be assumed by Linkage. Meng had kept BU’s Associate General Counsel, Dennis Hart, Esq., abreast of his progress in the negotiations with Linkage. Hart had participated in some of the discussions so he was able to concurrently prepare several proposed drafts of the agreement and keep draft agreements current with the understandings of Harkins and Meng as they negotiated a mutually acceptable final draft.
On March 5, 1991, BU notified officials who were responsible for purchasing, hiring and contracting that any future expenditure of more than $5,000.00 for contracted services required the approval of a Vice-President of the University and the Provost or in the alternative of Senior Vice-President Joseph Mercurio. On March 11, 1991, Meng notified Harkins of this directive.
In March 1991, Meng invited Harkins to go to Scottsdale, Arizona on April 3, 1991 to make a presentation to Boston University’s senior management staff who were attending the University’s annual trustees’ meeting at the International Conference Resort (IRC) in Scottsdale. Boston University Trustee Richard Joaquim is the principal of IRC. Joaquim’s company operates conference resort centers in several locations throughout the country, and the one at Scottsdale has complete recreational facilities including a golf course. At the meeting a formal discussion took place between President Silber, Vice-President Congdon, Vice-President Meng, Vice-President Mercurio, Executive Vice-President Westling, Phillip Harkins of Linkage and BU Trustee Richard Joaquim and his partner at IRC, Mr. Calucci. The men discussed the advisability of BU converting BUCEC into a resort hotel and conference center with a golf course, tennis courts and other amenities. Trustee Joaquim had been commissioned by President Silber and the Board of Trustees to look into the feasibility of BU converting the BUCEC site into such a hotel conference and recreation resort. Meng was strongly opposed to a university owned golf and resort conference center at BUCEC. Meng argued that there was a surplus of golf courses and hotel rooms in the area. He also argued that it was not good for the university’s image to run a golf course resort. Finally he argued that Harkins and Linkage had turned the situation around so that it was unnecessary to engage in such risk.
Meng failed to convince President Silber and Westling not to consider the golf course resort hotel project at the Tyngsborough site. This is demonstrated by a vote of the Trustees taken on June 25, 1991. On that date, the BU’s Board of Trustees approved the purchase of additional land at BUCEC for the purpose of having additional acreage to use for signage and an exit-entrance ramp for BU’s proposed commercial investment in a hotel/conference center with a golf course and other recreational facilities as amenities. I infer that the membership of Richard Joaquim, a hotel/resort center magnate, on the BU board of trustees had an effect on this decision, and; that Meng’s outspoken opposition to the hotel/resort concept hastened his banishment from BU’s inner circle of Silber advisors and confidants, and coincidentally had the effect of putting Linkage in jeopardy as the golf course/resort hotel/conference center concept could not easily co-exist with the psuedo-academic learning milieux of Linkage’s programs, seminars and conferences at the same site.
Soon after this meeting President Silber and Executive Vice President Jon Westling left Scottsdale together failing to attend the business plan presentation Harkins made to the rest of the assembled senior BU officials. However, even though Westling failed to attend Harkins’ presentation he learned soon thereafter that the projected gross revenues for BUCEC for fiscal 1991-1992 were in excess of $10,000,000.00.
Harkins presented the Linkage business plan for the next three years to the remaining BU senior executives at Scottsdale. Harkins perceived that his presentation had been well received, and he detected no difficulties in his relationship with BU’s management. Harkins was pleased that he had been invited to Scottsdale to address BU’s chief administrators.
Harkins reasonably relied on Meng’s representations that the Base Agreement would be renewed for an additional three years. Harkins acted upon these promises by hiring additional employees and expending funds to open an office in Chicago for the purpose of expanding Linkage’s FPDP business. Meng knew and approved of Harkins’ plans. More importantly, Harkins made no contingency plans to move his business to another location or to find other academic sponsors or clients.
A complication arose in the BU-Linkage contractual relationship. In February, 1991, the United States Postal Service conducted an investigation concerning the potential abuse by BU of its charitable institution bulk mailing rate through Linkage’s mailings for its Professional Development Seminars. The Postal Service’s investigation concluded that BU had improperly used its charitable institution bulk mailing for the PDS program. Since Linkage was a commercial enterprise and its operations with BU were commercial the use by Linkage of BU’s charitable bulk rate was unlawful. This Postal Service rate determination that the Linkage mailings were sent in a commercial context rather than in a charitable institution context was made in spite of BU’s general counsel’s vigorous representation before the Postal Service that the operation was charitable in nature. The Postal Service assessed BU for the deficiency in postal rates which had been underpaid for PDS mailings after the Base Agreement was terminated.
The Postal Service’s adverse ruling had significant effect on Linkage’s ability to turn a profit in its operation of the PDS programs under the Met College *543 contract. Harkins and Meng discussed possible solutions to the postal problem. Harkins and Meng agreed that the solution would be to terminate the Met College contract, and merge the PDS program into the Base Agreement. Under this procedure, Linkage would no longer incur the expenses for or receive the revenues from the PDS program. From then on, the PDS program was to be at BU’s risk or benefit and Linkage would receive a management fee for managing and operating the program. Discussions between Linkage and BU on this issue continued on until May 21, 1991 when Meng, acting for BU, and Harkins, acting for Linkage, signed a letter agreement terminating the Met College contract by merging the PDS program into the Base Agreement. In the May 21, 1991 letter agreement (Trial Ex. No 39) Meng, acting with actual authority, promised that the Base Agreement would be renewed. Harkins acted on that promise by commencing to expand the PDS program to Chicago. The loss of the PDS contract by Linkage was commercially disadvantageous to it and could only be recouped through the renewal of the Base Agreement as had been agreed by the parties.
Meng’s promise, in the May 21, 1991 letter, that the contract would be renewed was not happenstance. It came from a series of negotiations which started in March of 1991, between Meng, BU counsel Dennis Hart, Esq., Harkins, and Linkage comptroller Carr. These negotiations took the form of Hart transmitting a facsimile copy of a completed draft agreement to Carr on March 7, 1991. This draft stated that Linkage’s compensation for the next three fiscal years would be capped at $2,609,000, $2,869,000, and $3,156,890 respectively. The draft which Hart faxed to Carr contained some handwritten interlineations which Hart asked Carr to approve. Carr on the same day replied by fax, sending Hart a clean version of the draft which had adopted Hart’s suggestions. Hart also faxed Carr an internal BU memo from Hart to Meng which informed Meng that the university wanted the contract’s termination clause pegged to margin rather than revenue. Hart also suggested some other minor changes which were not of much consequence.
On March 8, 1991, Hart provided Meng with a copy of the latest contract draft and informed Meng that there was some disagreement between Hart and Carr on the treatment of the PDS contract in view of the postal problem. On April 23, 1991, Hart faxed Carr another proposed draft agreement. All issues had been agreed to except for the ultimate treatment of the PDS problem, and a new Linkage proposal that the compensation in each year be increased by a bonus based on performance. The bonus suggestion was not favored by Hart. It was suggested that Harkins should further negotiate this issue with Meng. Boston University discussed with Harkins the idea that he consider becoming an employee of the university and abandon or dissolve Linkage Corporation. Harkins consistently rejected any proposals to become a BU employee.
However, it is clear that as of May 21, 1991, the date that Harkins and Meng signed the letter agreement, that they had reached agreement on all of the subsidiary issues so as to bind the parties to a three-year contract where the parties agreed to the first year compensation to be paid to Linkage leaving the compensation issue for years two and three open for further negotiation during the 1991-1992 fiscal year. To signal that agreement had been reached, Meng sent a copy of the draft agreement he had worked out with Hart, Carr and Harkins to Westling and Congdon. Meng, operating as he always had in running things by his ostensible line of command superiors, closed his memo to these men by saying, “Does this need some further review in order to secure University approval?” Meng and Harkins were content that the contractual relationship between BU and Linkage was to be formalized by the agreement that they had reached with Hart’s and Carr’s assistance. Unbeknown to Meng and Harkins, dark storm clouds were forming which would destroy their business relationship, virtually destroy Linkage Corporation, and ruin the academic careers of Meng and his wife. The resulting tempest which occurred is a classic example of the perils of micromanagement by a chief executive, such as President Silber, of a major enterprise, such as Boston University.
James Devlin was a professor in the computer department of BU’s College of Liberal Arts. Devlin was President Silber’s son in-law and a part-time instructor employed by Linkage at BUCEC. Through Metropolitan College’s Dean Price, Devlin had nepotistically obtained a job as a part-time UNIX instructor at Linkage. Devlin, while teaching at Linkage, had developed a confrontational relationship with Harkins that was totally of Devlin’s own doing, and had turned Devlin into a disgruntled and disloyal Linkage employee. Devlin became friendly with Robert Daniels, a Linkage employee who was engaged in marketing efforts for the FPDP program. Daniels was another disgruntled Linkage employee.
Daniels’ salary as the marketing specialist for FPDP was dependent on commissions earned from selling the program to a fee paying participant or corporate sponsor. Daniels was not content with this arrangement. He had an argument with Harkins demanding that he be paid commissions from the fees and income earned from exhibitors at Linkage seminars, programs and conferences. Daniels had been a source of constant friction to Harkins. Daniels was the type of employee who is always more knowledgeable about an issue than anyone else, and who obliquely criticizes others out of a misguided sense of aggrandizement. Harkins on his part, tried to have a good relationship with Daniels, and did not take Daniels’ public carping and criticisms personally, because although Harkins *544 felt that Daniels was not a very productive manager, he was good with ideas and concepts in the marketing of Linkage’s programs and seminars. Harkins went out of his way to have Meng transfer Daniels to the BU payroll so that Daniels, as a BU employee assigned to Linkage could take advantage of BU’s employee benefit tuition waiver plan in order that Daniels could finish his doctoral training at minimum cost by availing himself of BU’s tuition remission program.
The storm began to gather in late March or early April 1991. At the time, James Devlin began to have discussions with his father-in-law, President Silber, about Linkage’s management and operation of BUCEC. I draw the inference that President Silber took what his son-in-law reported to him with a grain of salt. I take this inference because no activity to terminate Linkage took place until June 23, 1991 when President Silber, after returning from Heidelberg, ordered a surprise audit of Linkage and took other actions to terminate Linkage’s contract. Accordingly, I draw the inference that when BU acted upon these rumors and innuendoes which had been supplied to President Silber and Jon Westling by Devlin and Daniels, BU’s actions were entirely pretextual being actually motivated by what I infer was a desire by Silber and Westling to gain Linkage’s profits, customers and programs for BU, coupled with a desire to curry favor with BU trustee Richard Joaquim and his golf course, resort hotel and conference center concept at BUCEC.
Dr. Devlin was, as I previously found, a disgruntled Linkage employee. He had been employed to teach in the Focused Programmer Development Process (FPDP) Program. Although he was being paid $200 a day more than any other instructor at BUCEC, he had demanded additional compensation from Harkins. Harkins had refused to increase his compensation, and had informed Devlin on another occasion that his teaching performance was unsatisfactory and that it should be improved upon. Moreover, on another occasion, Harkins had been forced to chastise Devlin on his failure to properly assemble his course materials and his classroom conduct in respect to a racial issue which arose when Devlin made inappropriate racial and ethnic comments which offended some of the participants in Devlin’s UNIX class, and on another occasion when Devlin threw a computer disk at a participant. Devlin began to make unfair and inaccurate statements about Linkage which were motivated out of animus towards Harkins, and which were, I again infer, fueled by Daniels’ own ambitions to gain a more lucrative and influential post at the university at the expense of Harkins and Linkage. Devlin told his father-in-law that there were grave deficiencies in Linkage’s FPDP program which offered two distinct categories to its programming participants: an IBM program and a UNIX program. Devlin told President Silber that Linkage was having problems developing its UNIX program, and that he had been asked to take over a UNIX course because of student dissatisfaction. Devlin said that he had learned from others at Linkage that FPDP course development was incomplete and that course materials had not been fully tested. Devlin warned his father-in-law that Harkins’ planned expansion of the FPDP program to Chicago was premature. I infer that Devlin also passed on to his father-in-law what he deemed was other gossip and negative information about Linkage that he had learned from Robert Daniels.
Daniels, in the Spring of 1991, had talked to Devlin. In this discussion, Daniels informed James Devlin that Harkins was running his own private business on BUCEC’s campus in Tfyngsborough. Harkins was operating an employment agency which attempted to place programmers in high-tech jobs once they were trained. This revelation to Devlin was not much of a secret since the business, which was known as Data Processing Connections, had signage in the building identifying it, and everyone, including Meng knew about it. I infer that Daniels also told Devlin that Angela Kazanjian, now Angela Kazanjian Harkins, then a BU employee assigned to Linkage was having an affair with Harkins’ brother, James Harkins, a married man, who was the second highest ranked Linkage employee. I draw this inference that when Daniels met secretly with President Silber at his office on Sunday, June 30, 1991, Daniels told President Silber that, “Angela Kazanjian was sleeping her way up.’” Daniels wanted Silber to know that Kazanjian could not be trusted even though she was a BU employee.
As a result of the Devlin-Daniels-Silber discussions, BU became aware that Harkins had inappropriately charged $35.00 to the BUCEC good service department for a birthday party for his mother, and that Jim Harkins had obtained a free health club membership in return for giving a PDS seminar to a handful of the health club’s employees. BU should have earned 9.5% of the fees generated by this seminar. The total loss to BU was less that $300.00.1 find that these indiscretions, although improper, were a de minimis violation of the contract, and not a material breach of the contract.
Daniels had never spoken or met President Silber until the week of June 23, 1991. At that time Daniels, Harkins and other key Linkage employees were in New Jersey staffing a conference which Linkage was managing. On Sunday, June 23, 1991, Daniels while in New Jersey received a call that he should call President Silber at his home in Brookline. I infer that this call was from Devlin. At 9:34 A.M. Daniels spoke on the phone with President Silber, a man he had never spoken with before, for 38 minutes. Later, in the early afternoon, at approximately 12:29 P.M., Daniels spoke on the telephone with Devlin for 172 minutes. On June 24, 1991, at 10:15 A.M., he again spoke with Devlin for 11 minutes. A few minutes later at 10:32 A.M. he spoke again with Devlin for 25 minutes. Then at 4:49 *545 P.M., he again spoke to Devlin for 53 minutes. After this last call to Devlin he called Christine Rao to determine how the announced audit was going, and if Harkins had found out about the BU surprise audit which Silber had ordered. Later in the evening, at approximately 10:08 P.M., Daniels spoke with Devlin on the phone for over four hours. Yet another call was placed 10:06 P.M., June 25, 1991 between Devlin and Daniels which took 171 minutes to complete. At 12:03 A.M., June 26, 1991, Devlin and Daniels spoke again by telephone for a short while. This call was followed by a two-and-a-half-minute call from Christine Rao. Daniels placed another call to Devlin on June 27, 1991, at 11:53 P.M. which took 200 minutes to complete. The last call which was logged from the conference was a five-minute call to Devlin at 3:17 P.M., June 28, 1991. During the period of time between June 23 and June 28, Daniels was on the phone with Devlin for approximately 15 and a half hours, with Silber for 38 minutes, and with Rao for approximately ten minutes. I infer that the purpose of these long and late evening and early morning telephone conversations between Daniels and Devlin were for the purpose of informing President Silber and other BU employees, which Daniels knew would be conducting an audit, of where potential audit findings against the Linkage Corporation would be found.
Daniels had gone to work for Linkage in 1988. At his entry in 1988, Daniels was paid $40,000 plus commissions. In the summer of 1991, just prior to BU’s takeover of the BUCEC facility, Daniels was earning $45,000 a year plus approximately $15,000 in commissions. Immediately after the takeover on July 9, 1991, Daniels was appointed the Executive Director of BUCEC. Daniels’ salary was increased by BU to $70,000 per year. In January of 1992, Daniels salary was increased to $100,000 a year. Daniels’ employment with BU was terminated in January of 1994. On leaving BU, Daniels was provided with a severance compensation package which grossly exceeded other compensation packages granted to other BU employees, at the same level, namely one year of salary plus free tuition provided that he assist in BU’s legal defense in this action.
Daniel’s interest in capitalizing on Devlin’s close family relationship with President Silber, to advance himself at the expense of Harkins and the Linkage Corporation is best demonstrated by the testimony of Todd Langton, who is now a Linkage employee. Although there is obvious potential for bias on the part of this witness, I found him very open and totally credible. Langton described the events which occurred on July 3, 1991, when BU acted to take over the BUCEC site and terminate Linkage. Langton had gone to work for Linkage in January of 1991. At Linkage, Langton reported to Larry Carr when he worked on conference matters and to Roy Einreinhofer when assigned to other projects. Langton had worked on Linkage’s successful Windows Conference, and on July 20,1991, when Daniels was in charge of BUCEC’s conferences, Langton worked on the Downsizing Conference which, although planned by Harkins and the Linkage staff, was held under Daniels’ and Marvin Cook’s direction, after Linkage had been terminated. Langton described that after BU police officers and senior BU officials such as Westling, Mercurio and Dennis Hart, Esq. had seized control of the Linkage offices at BUCEC, the Linkage employees were called to a meeting. Executive Vice-President Jon Westling spoke to the assembled employees. Westling informed the Linkage employees that the contract between BU and Linkage had been terminated for cause, even though the BU administration was proud of the accomplishments and work of the Linkage employees. Westling told the assembled employees that BU was in a position to hire most of them as BU employees and that job interviews would immediately begin. The employees were asked to sign a paper which was being circulated so that BU management could schedule the interviews with the Linkage employees present at BUCEC. Later, Phillip Harkins spoke to the Linkage employees. Harkins told the employees that the BU takeover was a breach of contract, and that the attempt to hire them to be BU employees was illegal. Harkins said that Linkage would be suing BU for the breach of contract which had been committed by the University but that Linkage would never sue any of them or take any reprisals against them for going to work for BU. Harkins conveyed to his employees his concern for them to be able to earn a living, and that he understood why they might elect to go to work for BU.
Todd Langton was the last Linkage employee to be interviewed on July 3, 1991. BU’s Marvin Cook had been appointed BUCEC executive director for the purpose of the takeover with Bob Daniels to follow him later on. Cook, a BU vice-president, and in charge of automation as Chief Information Officer, interviewed Langton at about 7:00 P.M. Cook told Langton that he had heard good things about him. I infer that this came from information supplied by Daniels and Roy Einreinhofer when they met with President Silber on June 30, 1991, at BU’s administrative offices. Cook asked Langton to relate his background, education and experience. Langton kiddingly told Cook that he would like to hold the movie rights to the day’s events at BUCEC but Cook did not seem amused with Langton’s cynicism. After approximately 20 minutes of the interview had passed Cook hired Langton for BU, and promised Langton full tuition reimbursement for any academic program he wanted to pursue at BU. During the day of the takeover, July 2, 1991, Langton noted that Daniels and Devlin were both carrying telephone pagers. Langton had never previously observed Daniels or Devlin carrying “beepers.”
*546 Shortly after Langton arrived at his residence he received a telephone call from Daniels. Daniels spent approximately 35 minutes speaking with Langton. During the call Daniels was very chatty and gossipy. Daniels told Langton that he saw quite an opportunity for the former Linkage conference team now that BU had taken over. Daniels went over the skills and weaknesses of some of the former Linkage employees. They discussed that some of the employees had been upset and left in tears. Daniels gave Langton the rationale for BU’s takeover of the facility as basically that termination had been for cause.
Cook, during the job interview, told Langton to report to work early on Monday, July 8, 1991. It was Langton’s first day as a BU employee. Langton came in at 7:00 A.M. Langton noticed that Linkage correspondence addressed to Phillip Harkins and his brother James Harkins had been opened by BU employees and left on the table as trash. July 9, 1991, was Bob Daniels’s first day back on the job at BUCEC. Daniels invited Langton to lunch. Daniels and Langton discussed the operation of the conference department. Daniels told Langton that he had a vision for the conference department that would prove to be very successful.
Later on July 15, 1991, Langton had applied for admission to BU’s School of Management, and he needed a letter of recommendation from Daniels. Langton and Daniels started to talk. Daniels told Langton that Jim and Phil Harkins, the boys from Charlestown, as he termed them, had been exposed, that $750,000 had been discovered missing from Linkage’s accounts, and the Harkins brothers had shredded documents to keep them from falling into BU’s hands. Daniels told Langton that he had worked hard to save their respective jobs. Daniels also told Langton that there was a loophole in the contract which BU’s lawyers had found which permitted BU to hire the former Linkage employees even though the contract between BU and Linkage proscribed such hiring for one year after termination of the contract. Daniels, dropping Executive Vice-President Jon Westling’s name, told Langton that Westling was like a kid in a candy store when Daniels had described the conference business to Westling. Daniels said that Westling and the BU lawyers were looking for a way, “to permeate the contract.”
I draw the inference that Daniels and Devlin prior to June 23, 1991, were acting as agents of President Silber, and Jon Westling on BU’s behalf for the purpose of unlawfully terminating Linkage’s contract with the university, defaming Phillip and James Harkins, conspiring to interfere with Linkage’s advantageous contractual relationship with BU, and in league with Silber and Westling to steal Linkage’s employees, in direct violation of a contractual prohibition, so that BU could continue to operate BUCEC without interruption of its planned courses, conferences, seminars and other offerings which had been demonstrated to have been highly profitable by Linkage.
Factually, the conspiracy was hatched some time prior to May 22, 1991. On May 22, Meng and Harkins met with Westling at his office. It is to be noted that President Silber had asked Westling to conduct this meeting. At this meeting, after Harkins had outlined his plans and projections for the new three-year contract, Westling asked Harkins to provide him with additional information. In particular Westling wanted Harkins to detail the qualifications of each program instructor, the instructional quality of the programs offered by Linkage (i.e. a summary of the evaluations which had been submitted by course participants), an analysis of the outplacement services provided by Linkage for its participants, and information of the financial performance of Linkage programs. It is important to pause to note that Westling did not need to obtain any financial information on the fiscal performance of Linkage programs since Meng had set up a financial system which frequently provided to him a bottom line analysis of eveiy Linkage program. Moreover, two fiscal BU employees, Rao and Rosenberg, were at the BUCEC site, for the specific purpose of reporting to Meng on fiscal matters. Thus, all Silber and Westling needed to do to obtain detailed Linkage fiscal information, was to ask Meng for it. I find that Boston University’s later claim that Linkage was engaged in fiscal improprieties or failed to provide needed fiscal information when it was demanded has no basis in fact and that it is false. Indeed, during the three-year period that Linkage had a contractual relationship with BU, the university never chose to conduct an internal audit of the operations of this corporation.
Linkage’s financial performance under the Base Agreement at the close of the 1990-1991 fiscal year was exceeding projected revenue figures. On revenues of $9.7 million, Linkage produced a profit of $1.8 million.
In late May 1991, senior BU officers, led by President Silber, went to Europe to attend graduation ceremonies at BU’s external Heidelberg program. Heidelberg’s program was created as a continuing education program for matriculating students who were in the Armed Forces. This program, and two other foreign-based programs in London and Amsterdam, were among Meng’s responsibilities at BU. From Heidelberg, President Silber, on May 29, 1991, sent a telex to Westling (who was still in Boston), with copies to Congdon and Hart that if the Linkage-BU renewal contract had not been executed as yet, that its execution should be delayed until President Silber returned to Boston on June 17, 1991. President Silber did not discuss this matter with Meng who was also in Heidelberg.
In Boston, on June 24, 1991, a meeting took place in President Silber’s office, attended by Silber, Harkins, Meng, and Westling. In making his presen *547 tation Harkins gave President Silber a notebook, which contained the Linkage present operating contract with BU and a draft of the proposed renewal contract for the period 1991-1994. As Harkins began making his presentation, President Silber was rude and confrontational. President Silber was shouting and interrupting Harkins to make it virtually impossible for Harkins to rationally lay out his plan for the future of BUCEC. Indeed, I find that from Silber’s and Westling’s perspective the real purpose of the meeting was to discover which Linkage employees should be retained for BU’s future BUCEC operation. Silber interrogated Harkins about his employees. Harkins forthrightly described the strength and weaknesses of his key employees. However, before Harkins could complete his presentation or obtain a temporary extension of the contract, Silber angrily terminated the meeting by walking out. Silber’s ruse was that the financial data which Linkage was providing did not properly segregate the financial performance of Linkage programs conducted at BUCEC from those programs conducted at the BUCEC facility which were credit courses offered by BU itself. I find that President Silber knew the financial state of BUCEC, and that his protestations were false and pretextual, knowingly stated for the purpose of unlawfully breaching a solemn contractual relationship between the parties, and that the conduct of BU, President Silber and Jon Westling was in violation of the covenant of good faith and fair dealing which contracting parties owe to each other.
On June 25,. 1991, while Harkins was in New Jersey, conducting a BUCEC conference, President Silber launched an unannounced internal audit of Linkage’s financial records. I find that BU’s motive was not a businesslike concern to verify financial data and to correct any deficiencies in accounting and reporting procedures, but rather a calculated and pre-ordained effort to justify BU’s premeditated and wrongful repudiation of the Base Agreement, the March 1991 MET Contract Agreement, and the May 21 letter agreement between Linkage and BU. The audit’s only purpose and motivation was to create a pretext which would permit BU to take over the Linkage operation and to hire key Linkage employees in violation of the Base Agreement.
Harkins, put in a Kafkaesque situation by Silber, began to fight a rear guard action to try to salvage the situation for his company and its employees. On June 27, 1991, Harkins sent a letter to Meng with a copy to President Silber, requesting a 90-day extension of the Base Agreement while, “the university conducts an evaluation of Linkage [’s] performance and various alternatives for BUCEC.” In response to this letter, President Silber told Meng that he would only give Linkage 30 days’ notice from the date of his decision to terminate the contract, if his decision was not to renew. I infer that President Silber’s position was communicated to Harkins by Meng. On June 28, 1991, Harkins sent a letter to Meng, which was to be attached to a memorandum which was to be sent by Meng to President Silber. In this letter, Harkins advised Meng that if the Base Agreement was not to be extended, Linkage would be forced to give termination notices to its employees on July 1, 1991, and to cease all sales and marketing efforts. In Meng’s memo to President Silber, Meng informed the university president that Linkage would be forced to issue termination notices to its employees on July 1, 1991.
On Sunday, June 30, 1991, President Silber and Jon Westling arranged to meet secretly with Daniels and Roy Einreinhofer to interview them for the purpose of obtaining intelligence about Linkage’s programs, operations and employees. The key person at these extraordinary sessions conducted by Silber and Westling at BU was Robert Daniels. I infer that Daniel’s usefulness to Silber and Westling was that Daniels had been given the responsibility to assist in identifying and recruiting key Linkage employees who would be loyal to BU during the takeover which was to follow. I infer that Daniels was engaged by BU to shift Linkage employees to BU’s cause by spreading slanderous and malicious lies among Linkage employees about alleged wrongdoing at Linkage by Harkins such as, “cooking the books,” “embezzling $750,000,” and “shredding financial records.”[3] I find that such conduct violated the covenant of good faith and fair dealing which contracting parties owe each other.
On July 1, 1991 President Silber issued a letter which announced the appointment of Robert Daniels as BU’s new executive director of the BUCEC facility, replacing Harkins. This letter was drafted prior to any actual termination. Harkins and Meng were not informed of this decision when they once again met with President Silber and Jon Westling on the same day.
On July 1, just before Harkins was admitted to President Silber’s office, Meng told President Silber that he was resigning from his position at BU because he considered President Silber’s conduct vis-a-vis Linkage to have been unethical and immoral.
After Harkins was admitted to the office, President Silber told Harkins that he would only provide Linkage with a 30 days’ notice of termination if his ultimate decision was to terminate the contract between the parties. In this manner, Harkins would be able, in behalf of Linkage, to properly notify his employees of contract termination. Harkins advised Silber that if he had no assurance of the contract’s renewal he would be forced to give a 30-day notice to his employees that they would be terminated. Silber told Harkins, “If you force my hand, I will go to Tfyngsborough and appoint a new executive director.” Harkins being mindful of the contractual proscription against stealing the other’s employees, told President Silber that if the Linkage and BU contract was terminated he was interested in being able to hire BU employee Angela Kazanjian for *548 Linkage. President Silber agreed to allow Linkage to hire Kazanjian in the event of termination.
I infer that after leaving this meeting, Harkins, now fairly well certain that BU was going to terminate its contract with Linkage began to organize whatever defense of his business he could muster. James Harkins and Larry Carr met later with Linkage employee Roy Einreinhofer, the manager of the PDS program. Carr asked Einreinhofer whether Linkage’s computerized database records of all persons who had attended or were scheduled to attend PDS seminars had been backed up on tape storage drives from the computer hard drives. Einreinhofer was instructed to take the backup tapes into his personal possession so that they could transfer the data to floppy disks for retention by Linkage. Einreinhofer told Carr and James Harkins that he was not familiar with such a transfer procedure. James Harkins ordered Einreinhofer to give the backup tapes to Angela Kazanjian. After a short time had passed, Angela Kazanjian appeared in Einreinhofer’s office to take possession of the PDS backup database tapes. Einreinhofer has remained a BU employee at BUCEC managing the PDS program for the university. Einreinhofer has never been able to locate the backup database tapes he provided to Kazanjian at BUCEC again. Kazanjian is now married to James Harkins.
On this same weekend, Kazanjian, who was the manager of the BUCEC computer center, ordered Marc Vigneault to backup all BUCEC database files on to tape drives. Kazanjian received the backup tapes from Vigneault. Vigneault, now a BU employee, has never been able to find these backup tapes at BUCEC.
I find that Linkage’s actions in retrieving computer data of customer lists it had developed during the course of its legitimate business activities, although wrongful under the contract, was justified in view of BU’s outrageous conduct in unlawfully terminating the contract and endeavoring to destroy Linkage Corporation by stealing 38 out of its 42 employees. In the scheme of events Linkage’s act of self defense was not a material breach of the contract.
On July 2, 1991, Daniels sent a letter to President Silber urging Silber to take immediate action in respect to Linkage as Daniels believed that there would be difficulty in assuring the loyalty of Linkage employees to BU if too much delay occurred.
On July 3, 1991, President Silber scheduled another meeting with Harkins and Carr at BU. When Harkins and Carr arrived, Silber and Westling had already laid plans for the takeover and ejection of Linkage from the BUCEC campus, in the event that Harkins did not voluntarily agree to cease his operation, and voluntarily permit BU to hire all of his employees through waiving in writing the contractual provision which prohibited either party from hiring the other’s employees. Accordingly, in a manner reminiscent of how a military junta of a banana republic would stage a coup d’etat, Silber had arranged for a number of BU personnel to gather near BUCEC’s grounds. This takeover force consisted of BU vice-presidents and officers, led by Executive Vice-President Westling, included senior vice-president Joseph Mercurio and Dennis Hart, the associate general counsel, BU’s police department chief, a number of uninformed and armed BU police officers in BU police cruisers, some BU police officers in plain clothes, locksmiths, internal auditing employees, and other personnel. The group’s plan was to forcefully takeover and secure the facility upon receipt of Silber’s orders.
As soon as Harkins and Carr had seated themselves in President Silber’s office, Silber handed Harkins a multi-page typed agreement and asked Harkins to sign it. The proposed agreement which Silber had handed Harkins provided that Linkage agreed to the termination of all agreements with Boston University and that Linkage would waive the “no-hire” clause of the Base Agreement. Harkins examined the document. Harkins told Silber that this appeared to call for the destruction of his business and that he wanted his lawyer to review the document for him. Silber angrily snatched the document from Harkins hands and replaced it with a multi-page typed termination letter. Harkins and Carr left the office with the termination letter in Harkins’ hand. President Silber then launched the takeover of the Tyngsborough BUCEC facility. President Silber when he acted to terminate the contract knew or should have known that Linkage had committed no material breaches of its contract, and BU’s own breach of contract were caused by the actions of its own officers which were knowing and willful, and in reckless disregard of the facts which could have been easily verified.
Immediately after leaving Silber’s office, Harkins called his brother James Harkins at BUCEC. James Harkins informed Phillip Harkins thatBU officials and police were in the process of taking over the BUCEC facility.
Harkins arrived at the BUCEC facility within an hour of leaving Silber’s office. When he arrived, Boston University police were stationed outside of the building, and some had secured the interior of the building. Harkins was told by Dennis Hart and other BU officials that he could not remove any documents or papers, including his own personal papers and his mother’s tax return, as no papers would be permitted to be removed from the facility before they were examined by BU officials. BU officials confiscated Phillip Harkins’ teaching materials, books and even his personal rolodex telephone directory.
University officials gathered all the Linkage employees into a room. Executive Vice-President Jon Westling, the highest placed BU official under Silber, told the assembled Linkage employees that the BU-Linkage contract had been terminated “for cause.” Jon Westling knew, at the time that he made these state *549 ments, that Linkage had not committed any material breaches of the contract. The BU officials in charge of recruiting Linkage employees, armed with previously prepared offers of employment form letters, began the process of interviewing and hiring Linkage employees. BU extended offers to 28 of the 32 Linkage employees who had worked at Linkage for Harkins. Many of these employees were enticed to leave Linkage by the granting of substantial salary increases and a much improved benefits package.
Harkins addressed the employees. He informed his employees that BU had breached its contract with Linkage. He told his employees that in his view BU’s action against Linkage was illegal and that he was going to sue BU for damages. He told the employees that because of BU’s actions he could not guarantee that there would be work in the short run at Linkage for them. Harkins told his employees that although it was illegal for BU to hire them in violation of the “no hire’” clause of the agreement that Linkage would never take any action against them personally to harm their livelihood.
Due to BU’s action of preventing Harkins and other Linkage executives from taking any papers or documents with them until they were examined and photocopied by the university, Harkins and his brother James were compelled to stay in the BUCEC building until 4:00 A.M. on July 4, 1991, when they were finally permitted to leave with the papers and documents they claimed as their own.
After BU’s takeover of the former Linkage operation at BUCEC, the university continued to conduct an audit of Linkage management of the facility. The audit was conducted over approximately two months by a team of seven BU employees working in BU’s office of internal audit. Inside and outside counsel employed by the university also investigated Linkage’s affairs. These investigations produced no evidence that any material breaches or wrongdoing had taken place during Linkage’s tenure as the manager and operator of BUCEC.
The result of BU’s unlawful takeover of BUCEC, in breach of its contractual agreements, was that Linkage, as a going business was destroyed. It has taken Phillip Harkins, and the other executives at Linkage a full year to rebuild the work force and corporation itself to the same strength it had been in on July 3, 1991.
I find that BU’s action was an unfair or deceptive practice in the conduct of a trade or business as declared unlawful by the provisions of G.L.c. 93A, and that Linkage Corporation may recover its actual damages as determined by the jury, whose advisory verdict I adopt as my own damage calculations, and as I find that the acts of Boston University were a willful and knowing of G.L.c. 93A, §2, I double the damages. Accordingly, I find that Linkage is entitled to $2,053,634 in c. 93A damages, which doubled is $4,107,268. Of this amount, $2,053,634 represents a double recovery; thus, Linkage is entitled to $2,053,634 in c. 93A damages. Moreover, pursuant to G.L.c. 93A, §11, I award the plaintiff reasonable attorney’s fees and costs as follows: $753,226.06 in attorneys fees and $146,614.98 in costs for a total of $899,841.04
RULINGS OF LAW
Linkage alleges that BU’s conduct violated G.L.c. 93A, §11 and seeks double or treble damages and attorneys fees. To this claim, BU asserts that c. 93A liability is not warranted because (1) BU, as an educational institution, was not engaged in trade or commerce; (2) c. 93A does not apply to intra-corporate disputes; (3) on the evidence presented, BU’s actions do not violate c. 93A or support a finding of double or treble damages; and (4) G.L.c. 231, §85K caps Linkage’s damages at $20,000. BU’s arguments are without merit.
“The Legislature originally enacted c. 93A to improve the commercial relationship between consumers and businessmen. By requiring proper disclosure of relevant information and proscribing unfair or deceptive acts or practices, the Legislature strove to encourage more equitable behavior in the marketplace." Planned Parenthood Federation of America, Inc. v. Problem Pregnancy ofWorcester, Inc., 398 Mass. 480, 492 (1986), quoting Manning v. Zuckerman, 388 Mass. 8, 12 (1983). Section 11 extends coverage “to individuals engaged in trade or commerce in business transactions with others engaged in trade or commerce.” Planned Parenthood Federation of America, supra at 492. Thus, G.L.c. 93A, §11 prohibits any “unfair method of competition or an unfair, or deceptive act or practice.”
In this case, BU asserts that its status as a charitable corporation precludes c. 93A liability because BU neither engages in trade nor commerce. BU’s status as a charitable corporation is not, in and of itself, dispositive of the issue of whether c. 93A applies. Planned Parenthood Federation of America, Inc., supra at 493; see Miller v. Risk Management Foundation of the Harvard Medical Institutions, Inc., 36 Mass.App.Ct. 411, 416 (1994), rev. denied 418 Mass. 1104 (1994). Rather, the court should focus on whether the acts complained of were performed in a business context. Planned Parenthood Federation of America, Inc., supra at 493; Miller, supra at 416. In determining whether the parties are acting in a business context, the court should consider “the character of the party, the nature of the transaction, the activities engaged in by the party, and whether the transaction was motivated by business or personal reasons.” Miller, supra at 416, quoting Barrett v. Massachusetts Insurers Insolvency Fund, 412 Mass. 774, 775-76 (1992); see AÍÍ Seasons Services, Inc. v. Comm’r of Health & Hospitals of Boston, 416 Mass. 269, 271 (1993).
Here, it is evident that BU operated BUCEC as a commercial venture. BU’s motivation in opening *550 BUCEC was to provide a cash stream to offset the facility’s debt service. BU bankrolled this operation by seeking corporate clients rather than traditional students. The University hired Linkage to manage and operate BUCEC as an ongoing independent business entity rather than educational institution. Although Linkage provided training seminars to corporate clients under BU’s auspices, and in some circumstances offered academic credit, this does not alter BUCEC’s “for profit” nature. Indeed, BU profited from BUCEC and regarded Linkage as a “cash cow.” Accordingly, BU engaged in trade or commerce by operating a facility designed to provide corporate training services.
Similarly, BU’s attempt to take shelter behind the $20,000 limit of G.L.c. 231, §85K is without merit. See Miller, supraat 417 n.9. The charitable cap is applicable only “if the tort was committed in the course of any activity carried on to accomplish directly the charitable purposes of such corporation, trust, or association . . .” G.L.c. 231, §85K. As discussed above, BU’s activities were for business purposes, and, thus, the statute is not applicable.
BU further argues that c. 93A is inapplicable because the relationship between BU and Linkage was private in nature. “The unfair or deceptive acts or practices prohibited [under G.L.c. 93A] are those that may arise in dealings between discrete, independent business entities, and not those that may occur within a single company.” Puritan Medical Center, Inc. v. Cashman, 413 Mass. 167, 179 (1992), quoting Manning v. Zuckerman, 388 Mass. 8, 12 (1983); see Szalla v. Locke, 37 Mass.App.Ct. 346, 356 (1994) (c. 93A applicable where two independent businessmen deal with each other at arm’s length in a commercial context in a public arena); but see Saint Louis v. Baystate Medical Center, Inc., 30 Mass.App.Ct. 393, 404 (1991) (finding that 93A claim arising out of relationship between hospital and independently incorporated anesthesiology department constituted an intra-enterprise dispute). Thus, c. 93A does not apply to dealings between a single, legal entity such as a partnership, see Newton v. Mojfie, 13 Mass. App.Ct. 462, 467 (1982), or a corporation, see Riseman v. Orion Research, Inc., 394 Mass. 311, 314 (1985); Alperin v. E. Smelting & Refining Corp., 32 Mass.App.Ct. 539 (1992).
In this case, it is undisputed that Linkage and BU are two separate corporate entities. Linkage was an independent contractor hired by BU to manage and operate BUCEC. Although BU had ultimate control over Linkage’s activities, Linkage developed its own courses and marketing strategy, and hired its own employees. There is simply no basis for finding that BU and Linkage constituted one single company.[4]
In order to hold a party liable for a violation of G.L.c. 93A, §11 “[t]he [parties’] objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce.” Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979). In the business context, a c. 93A claim may be based on a claim of promissory estoppel. See e.g. Jet-Line Services, Inc. v. American Employers Ins. Co., 404 Mass. 706, 717 (1989); Chamberlayne School & Chamberlayne Jr. College v. Banker, 30 Mass.App.Ct. 346, 353 (1991); Rex Lumber Co. v. Acton Block Co. Inc., 29 Mass.App.Ct. 510, 518-19 (1990); Wasserman v. Agnastopoulos, 22 Mass.App.Ct. 672, 679 (1986); Greenstein v. Flatley, 19 Mass.App.Ct. 351, 356 (1985). In c. 93A cases, the test for promissory estoppel has two prongs: “(1) the certainty and specificity of defendant’s promise, which the defendant does not fulfill; and (2) apart from defendant’s promise, the knowledge and foreseeability of the plaintiffs reliance and the degree of that reliance.” Michael C. Gilleran, The Law of Chapter 93A §4.12, p. 132 (1989), citing Greenstein, supraat 357 and Pappas Industrial Parks, Inc. v. Psarros, 24 Mass.App.Ct. 596, 599 (1987).
Here, both the jury verdict and this court’s independent findings of fact call for the conclusion that BU violated c. 93A by inducing Linkage to rely on its promise to enter into a new contract. More colloquially put, this is a case where there has been a “pattern of conduct by one side which has dangled the other side on a string.” Pappas Industrial Parks, Inc., supra at 598. Linkage established that BU made a specific and binding promise to enter into a new contract at the expiration of the Base Contract. BU knew that Linkage would rely on its promise, and, indeed, Linkage reasonably relied on BU’s representations. BU did not fulfill its promise and, thus, Linkage is entitled to c. 93A damages. This court is guided by the jury’s determination of damages and adopts the jury’s damage award. Accordingly, Linkage is entitled to damages in the amount of $787,239.[5]
Moreover, a party liable for intentional interference with advantageous relations, can also be held liable for a violation of c. 93A. See Piccvuto v. Dwyer, 32 Mass.App.Ct. 137, 139 (1992). “In an action for intentional interference with advantageous relations the plaintiff must prove that: (1) a business relationship or contemplated contract of economic benefit; (2) the defendant’s knowledge of such relationship; (3) the defendant’s intentional and malicious interference with it; and (4) the plaintiffs loss of advantage directly resulting from defendant’s conduct.” Powers v. Leno, 24 Mass .App.Ct. 381, 385 (1987).
Again, both the jury verdict and this court’s findings compel the conclusion that BU violated c. 93A by unjustly interfering with Linkage’s relationship with its employees. The evidence is clear: BU purposefully and maliciously interfered with Linkage’s relationship with its employees in order to put Linkage out of business and allow BU to successfully run BUCEC. “Such conduct certainly falls far below the acceptable level of fair dealing that c. 93A was designed to pro *551 mote and easily attains the ‘level of rascality’ giving rise to an action under the statute.” Piccicuto, supra at 139; see also Anthony’s Pier Four, Inc. v. HBC Assoc., 411 Mass. 451, 474 (conduct in disregard of known contractual arrangements and intended to secure the benefits for the breaching party constitutes an unfair act or practice); Wang Laboratories Inc. v. Business Incentives, Inc., 398 Mass. 854, 860 (1986). Accordingly, as BU’s intentional interference with Linkage’s advantageous relations with its employees constitutes a violation of c. 93A, the court adopts the juiy’s finding as to damages and awards Linkage damages in the amount of $280,000.
Finally, BU violated c. 93A by defaming Linkage and its principals. Defamation, in a business context, is actionable as a violation of G.L.c. 93A. See McAvoy v. Shufrin, 401 Mass. 593, 601 (1988); A.F.M. Corp. v. Corporate Aircraft Management, 626 F.Supp. 1533, 1552 (D.C. Mass. 1985). The elements of a slander action consist of a false and defamatoiy[6] statement concerning plaintiff which is published to a third party and results in damages. Richard W. Bishop, Prima Facie Case, §1202, p. 349 (1987). A plaintiff may recover damages when the spoken words constitute slander per se; i.e. the words charge plaintiff with a crime, see Bander v. Metropolitan Life Ins. Co., 313 Mass. 337, 341 (1943), or impute an unfitness for or misconduct in his office or employment, see Brown v. Journal Newspaper Co., 219 Mass. 486, 487 (1914). If, however, the statement does not constitute slander per se, the plaintiff must establish special damages. Bishop, supra at §1208, p. 361.
Here, Daniels told Langton and other BU (ex-Linkage) employees that the Harkins had cooked the books, embezzled $750,000 and shredded financial records. Clearly, Daniels’ remarks charge the Harkins with criminal activities, i.e. fraud and embezzlement, and import the fact that the Harkins are unfit to run a corporation. In essence, Daniels acted as BU’s agent provocateur and with the approval of the BU hierarchy, including President Silber, sowed the seeds of discord among Linkage’s employees. See Int’l Brotherhood of Police Officers, Local 1433 v. Memorial Press, Inc., 31 Mass.App.Ct. 138, 140 (1991) (in order to hold employer vicariously liable for intentional conduct the court must find whether employee’s conduct is motivated by a purpose to serve the employer).[7] The jury found, and this court agrees, that BU defamed Linkage. Accordingly, the court adopts the jury’s damage award of $1,060,641.00.
In sum, Linkage is entitled to c. 93A damages in the amount of $2,127,880. From this amount, the court will offset the damages due to BU, $74,246, allowing for $2,053,634 in c. 93A damages. The court finds that BU’s actions were willful and knowing and thus doubles the c. 93A damage award pursuant to G.L.c. 93A, §11 s 5. Thus, Linkage is entitled to $4,107,268. ($2,053,634 x 2) in c. 93A damages.
Of this amount, $2,053,634 represents a double recovery because the jury has previously compensated Linkage for damages pursuant to its claims for promissory estoppel, intentional interference with advantageous relations, and defamation. See Wyler v. Bonnell Motors, Inc., 35 Mass.App.Ct. 563, 568 (1993), rev. denied 416 Mass. 1111 (1994) (c. 93A damages are subsumed to damages recovered under parallel common law claims). The punitive damage component of the c. 93A damages ($2,053,634) are not, however, subsumed in the recovery of the underlying common law claim. Id. Thus, a judgment is to enter for $2,053,634 on Linkage’s c. 93A claim.
Furthermore, Linkage is entitled to attorneys fees and costs. G.L.c. 93A, §11, ¶6. The court will evaluate Linkage’s request for attorneys fees pursuant to the standard enumerated in Linthicum v. Archambault, 379 Mass. 381 (1979); see Miller, supra at 421. “The judge . . . should consider the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area and the amount of awards in similar cases.” Linthicum, supra at 388-89. See Miller, supra at 421.
Here, the court has thoroughly examined Linkage’s submissions regarding attorneys fees. The court credits Allen van Gestel’s affidavit and concludes that Morrison, Mahoney & Miller charged reasonable hourly fees for the work they performed. The court has had substantial first-hand experience with this case, and acknowledges that it is a legally complex and factually intensive matter. Upon examination of Morrison, Mahoney & Miller’s time sheets, however, the court concludes that Morrison, Mahoney & Miller performed unnecessary and repetitive work. Thus, in the court’s discretion, Morrison, Mahoney & Miller’s outstanding fee of $1,124,218.00 is to be reduced by 331/3% for a total of $753,226.06. As for Morrison, Mahoney & Miller’s disbursements, the court finds that the $14,262.11 in computer research fees is excessive. This fee will be reduced by 50% for a total of $7,131.05 in Lexis/Westlaw fees, allowing for a recovery of $94,182.10 in disbursements. Accordingly, BU is liable for $847,408.16 in attorneys fees. Furthermore, Linkage is entitled to recover costs it incurred in prosecuting its lawsuit. Linkage expended $33,318 for an expert witness and $19,114.88 in additional expenses for a total of $52,432.88 in fees. Accordingly, Linkage is entitled to recover $899,841.04 in attorneys fees and costs.
ORDER
This court orders that judgment enter for Linkage on its G.L.c. 93A, §11 claim, in the amount of $2,053,634 in damages and $899,841.04 in attorneys costs and fees.

 Under the terms of MHEFA’s legislative mandate its *552 financing benefits are only available to “non-profit” educational or medical institutions whose programs further education. G.L.c. 69 App., §2.3.

Metropolitan College is BU’s continuing education night and weekend division.

At trial, President Silber in his testimony before the jury, used the same terminology, “cooked the books” in describing what he deemed was Harkins’ wrongdoing at BUCEC.

BU cites Saint Louis for the proposition that close dealings between two corporations renders them one enterprise. In St Louis, the Appeals Court determined that a dispute between a hospital and its independently incorporated anesthesiology department did not trigger a claim under c. 93A because the parties’ dispute was intra-enterprise. Saint Louis is not applicable to the facts of this case as the anesthesiology corporation constituted an integral and irreplaceable part of the hospital and provided essential hospital services. Moreover, the hospital maintained total control over the anesthesiology department by naming the department head, administering general hospital policy and disciplining various doctors within the anesthesiology unit. Here, on the other hand, BU essentially provided Linkage a free hand to manage BUCEC. BUCEC was not avital component of BU’s day-to-day operations and indeed was recognized by BU as an independent entity.

Although the evidence indicates that Boston University breached the renewal agreement, the court finds that awarding c. 93A damages for both promissory estoppel and breach of contract would be duplicative.

A defamatory statement is any statement which would discredit the plaintiff in the minds of a respectable segment of the community. New England Tractor Trailer Training of Ct. v. Globe Newspaper Co., 395 Mass. 471, 479 (1985).

Prior to Boston University’s July 3 takeover of Linkage, Daniels, a Linkage employee, was surreptitiously working on Boston University’s behalf. After the takeover, Boston University hired Daniels at which point Daniels told Langton about the Harkins’ supposed misdeeds. At all relevant times, however, Daniels was acting as Boston University’s agent.