Barrett, J.
This matter is before the court on defendants’ motion for summary judgment on all counts of the plaintiffs complaint.[2] The plaintiff, Bernardo Nadal-Ginard, has alleged twelve counts against Children’s Hospital Corp. and its trustees arising from actions taken by the defendants upon their discovery of plaintiffs involvement in the embezzlement of funds from the Boston Children’s Heart Foundation, Inc. (BCHF), a tax-exempt foundation established to carry out the functions of the Hospital’s Department of Cardiology.
Defendants argue that the complaint raises issues which have been fully litigated in the United States District Court before Judge Robert E. Keeton[3] and in the Superior Court in a criminal case before Judge Christine McEvoy[4] and that the judgments in those cases preclude the relitigation of those issues in the instant action.[5] Defendants assert that the preclusive effect of the court’s findings in the federal civil case and the jury’s verdicts in the state criminal case result in the failure of Nadal’s emotional distress claim (Count 1), privacy claims (Counts 2 and 3), intentional interference claims (Counts 4, 5 and 8) and contract claims (Counts 9, 10 and 11) as a matter of law. Defendants further argue that plaintiffs conversion and negligence claims (Counts 6 and 7) must fail because plaintiff has no property rights in the intellectual property at issue and that plaintiffs c. 93A claim (Count 12) fails because plaintiff was not engaged in trade or commerce with the Hospital, thus rendering the statute inapplicable. Finally, defendants argue that those individual defendants who are unpaid trustees of the Hospital, a charitable institution, are immune to suit pursuant to G.L.c. 231, §85W, and that Children’s charitable immunity caps any recovery against it at $20,000, pursuant to G.L.c. 231, §85K.
In opposition, Nadal argues that this court should stay action on this motion until the First Circuit renders its decision on his appeal of the Keeton decision.[6] Plaintiff makes a similar argument in opposition to granting summary judgment based upon the criminal verdicts, which are also on appeal.[7] Alternatively, Nadal argues that neither the federal nor state judgments foreclose him from maintaining these claims which, he contends, raise genuine issues of material fact distinct from and not addressed by either prior action. In particular, plaintiff notes that Judge Keeton did not consider whether these defendants (who were not parties to the federal action) had destroyed plaintiffs property, sabotaged his research projects or exposed him to public humiliation and ridicule.
BACKGROUND
The following undisputed facts are derived from the pleadings and affidavits and exhibits thereto submitted by the parties.
Nadal was appointed Chairman of Children’s Department of Cardiology in 1982. As Chief of the Department, Nadal was an official of Children’s Medical Staff and was accountable to the Medical Staff Executive Committee and the Board of Trustees for all professional and administrative duties within his department.
The Boston Children’s Heart Foundation, Inc. (“BCHF”) was established in 1983. Pursuant to the BCHF Operating Agreement (“the Operating Agreement”), signed on July 1, 1983 by Nadal on behalf of BCHF and by defendant David Weiner (“Weiner”) on behalf of Children’s, the Chief of the Cardiology Department automatically serves as the President of BCHF, with responsibility for its day to day affairs. According to the Operating Agreement, BCHF is responsible for carrying out the cardiology department’s *508 clinical and teaching activities as well as research activities and administrative duties.
In late September and early October of 1993 other members of BCHF became aware of possible financial misconduct by Nadal and brought a civil suit against him in federal court in November 1993. At approximately the same time, the Massachusetts Attorney General commenced a grand jury investigation into Nadal’s alleged misconduct, which resulted in the issuance of indictments on twenty-two separate felony charges of embezzling or stealing an amount greater than $250. Nadal’s appointment as Chairman of the Department of Cardiology was terminated by the Hospital effective December 31, 1993. In addition, on January 18, 1994 the Hospital’s Board of Trustees voted to accept the recommendation of the Hospital’s Medical Staff Executive Committee that Nadal’s medical staff membership and all privileges at the Hospital be revoked. An internal Fair Hearing Committee considered an appeal of that decision on April 12, 1995, and upheld it as justified, issuing a 45-page decision recommending that the Board affirm its prior decision to revoke Nadal’s medical staff membership and privileges.
On December 21, 1994, after a bench trial, Judge Keeton entered a judgment against Nadal in excess of $6.5 million, including damages, prejudgment interest and attorneys fees. Judge Keeton found that Nadal had engaged in substantial unlawful financial misconduct which resulted in personal financial benefit to Nadal.
On May 26, 1995 a Suffolk County Superior Court juiy found Nadal guilty on twelve felony counts of larceny. On June 5, 1995 Judge McEvoy adjudged Nadal a common and notorious thief on the basis of those convictions and sentenced him to serve one year in the House of Corrections, to be followed by a three to five year suspended sentence in state prison. Nadal has appealed those convictions and his sentence was stayed pending the outcome of that appeal.
Plaintiff notes certain undisputed facts regarding his treatment by Hospital officials after his financial misconduct was initially discovered. Nadal asserts other facts which are contested.[8] The undisputed facts reveal that on October 22, 1993 Nadal requested a medical leave of absence from his position as Chairman of the Department of Cardiology. The leave was granted. Three days later, Nadal returned to his office at the Hospital and found the lock had been changed. While standing outside of his office Nadal was informed that he would not be allowed to reenter without being accompanied by a Hospital official. Carol Weinrib, a Hospital Vice-President, stayed with Nadal while he gathered papers and reviewed each before allowing him to leave. After the plaintiff gathered his papers, Weinrib refused to allow him to go to the President’s office unescorted. These actions occurred in public view of numerous colleagues and subordinates and caused the plaintiff to feel humiliated. Shortly thereafter, Nadal’s access code to the Hospital’s research lab was deactivated and he was no longer able to gain access to those laboratories to perform his research activities. Thereafter, Nadal’s name was removed from Hospital directories and name-plates and his hospital phone line was disconnected. Additionally, plaintiff states that grant-making agencies were informed of his suspected financial misconduct[9] and that his office was searched without his being present. Both parties concede that the Hospital has an intellectual property policy which governs the rights of both the Hospital and the plaintiff regarding patentable inventions developed while working under the auspices of the Hospital. Finally, the parties agree that the Hospital gave Nadal a computer tape containing his research files.[10]
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact in dispute and where the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56 (c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, “and [further,] that the moving party is entitled to judgment as a matter of law.” Pederson v. Time Inc., 404 Mass. 14, 17 (1989). “A complete failure of proof concerning an essential element of the non-moving party’s case renders all other facts immaterial” and mandates summary judgment in favor of the moving party. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991) (citing Celotex v. Catrett, 477 U.S. 317, 322 (1986)).
I. This Court Will Not Stay A Decision On Summary Judgment Pending The Outcome Of The Federal Appeal
Plaintiff seeks to have this court stay its action on defendants’ summary judgment motion pending the outcome of the appeals pending in both the federal and criminal matters. While issues of judicial economy and fairness may appear to support such an action,[11] federal caselaw pertaining to collateral estoppel holds that the res judicata effect of a judgment is not destroyed by the pendency of an appeal, even if the judgment has been stayed pending the appeal. In Re Belmont Realty Corp., 11 F.3d 1092, 1095-96 (1st Cir. 1993); Taunton Gardens Co. v. Hills, 557 F.2d 877, 879 n.2 (1st Cir. 1977). Insofar as it is federal rather than state law which determines the extent to which Nadal is bound by Judge Keeton’s findings in the federal decision, Whitehall Co., Ltd. v. Barletta, 404 Mass. 497, 501 (1989), collateral estoppel bars relitigation of any issue that “constituted, logically or practically, a necessary *509 component of the decision reached” in the prior proceeding. Belmont, supra at 1097.
Although state law grants this court more flexibility in determining whether “the litigation of a particular issue has reached such a stage that a court sees no really good reason for it to be litigated again,” Tausevich v. Board of Appeals of Stoughton, 402 Mass. 146, 149 (1988), quoting Lummus Co. v. Commonwealth Oil Refining Co., 297 F.2d 80, 89 (2d Cir. 1961), cert. denied, 368 U.S. 986 (1962), thereby permitting this court to stay the collateral estoppel effect of the criminal verdicts, I nonetheless recognize the effect of the necessary findings supporting the federal decision upon matters at issue in the instant case.
II.Summary Judgment is Awarded to the Defendants on the Emotional Distress Claim (Count 1).
In Count 1 Nadal claims he was a victim of intentional infliction of emotional distress when the Hospital restricted his previous free access and use of Hospital office space, laboratories, telephone and mail service after the allegations of financial embezzlement surfaced.
To prove this claim plaintiff must prove that defendants engaged in conduct that was “extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community.” Sena v. Commonwealth, 417 Mass. 250, 264 (1994), quoting Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976). “Liability cannot be founded upon mere insults, threats or annoyances.” Id. Moreover, the Appeals Court has found that “investigation and reporting ... of suspected embezzlement [which is] founded upon reasonable apprehension based upon objective facts” does not constitute the intentional infliction of emotional distress. Conway v. Smerling, 37 Mass.App.Ct. 1, 8 (1994).
The actions of the defendants which the plaintiff would have the court find “utterly intolerable in a civilized community” are perfectly acceptable actions. The plaintiff claims that he was locked out of his office, and that he was seen to be locked out of his office “by a gathering crowd of spectators.” He also argues that his phone and mail service at the hospital were interrupted, and similar things. These actions constitute the basis of his claim. Such actions are certainly well within the bounds of tolerable action within a civilized community, when an employer has discovered a theft by its employee of five and a half or more million dollars. In the language of the Appeals Court in the recent case of Conway, “Nothing remotely approaching profoundly shocking conduct occurred in this case,” and therefore the defendants are entitled to summary judgment as a matter of law. Conway, supra at 8.
III.Summary Judgment is Awarded to the Defendants on the Invasion of Privacy Claims (Counts 2 and 3).
Nadal asserts two separate claims for unlawful invasion of privacy under G.L.c. 214, §1B. Count 2 alleges that defendants informed other medical staff members that Nadal was not expected to return to the Hospital and that defendants interacted with grant-making agencies in a manner designed to inform them that the plaintiff had engaged in serious financial misconduct. Count 3 alleges that defendants allowed Nadal’s office to be searched after allegations of his financial misconduct came to light.
Section IB of c. 214 provides that “[a] person shall have a right against unreasonable, substantial or serious interference with his privacy.” In the workplace context, §1B requires the Court “to balance the employer’s legitimate business interest in obtaining and publishing the information against the substan-tiality of the intrusion on the employee’s privacy resulting from the disclosure.” Bratt v. International Business Machines Corp., 392 Mass. 508, 521 (1984). “(L)egitimate countervailing . . . interests in certain situations may render disclosure of personal information reasonable and not actionable under the statute.” Id. at 520.
Judge Keeton’s findings show that Children’s had cause to suspect the plaintiff of embezzlement. The decisions of Massachusetts courts in similar situations establish that as a matter of law it is not an invasion of privacy to explain to other hospital staff members how to carry on in the plaintiffs absence, and to speak to grant-making agencies as well. Mulrew v. Taunton, 410 Mass. 631, 637 (1991) (affirming summary judgment against claim that employer breached privacy by voicing reasonable suspicions about plaintiffs work ability); Conway v. Smerling, supra at 7 (given reasonable suspicion that employee is guilty of embezzlement, employer may disclose related facts).
IV.Summary Judgment is Allowed as to the Claim for Intentional Interference with
Advantageous Business Relations (Count 4) and the G. L. c. 93A Claim (Count 12).
In Count Four, the plaintiff complains that the hospital has denied him access to hospital laboratories where he worked and on that basis makes a claim for intentional interference with advantageous business relations. A similar situation arose where several doctors sued the Baystate Medical Center. Saint Louis v. Baystate Medical Center, Inc., 30 Mass.App.Ct. 393 (1991). Here, physicians lost staff privileges at the hospital and on that basis they also sued for the intentional interference with advantageous business relations. Here the Appeal Court held, “Baystate cannot be liable for interference in its own affairs any more than an employer is liable for tortious *510 interference between itself and an employee.” Id. at 404.
Again analogously, the doctors in the Saint Louis case made out a G.L.c. 93A claim. Here the court held, “Once again, as to Baystate, the c. 93A claim fizzles because c. 93A does not apply to intra-enterprise disputes.” Id. Accordingly, summary judgment is allowed on Counts Four and Twelve.
V. Summary Judgment is Allowed as to the Plaintiffs Claim for Intentional Interference with Contract Rights (Count 5), the Claim for Intentional Interference with Employment Contract (Count 8).
Count Five alleges that the hospital has deliberately interfered with the plaintiffs ability to renew or to transfer the grants under which he worked while at the hospital, and additionally that the hospital has not found other investigators to carry on work with the grants. To make out a claim for the intentional interference with contractual relations, the plaintiff must demonstrate (1) that he had a contract with a third party, (2) that the defendant knowingly induced the third party to break that contract, (3) that the defendant’s conduct was not only intentional but also improper in motives or in means and (4) that the plaintiff was harmed by the defendant’s actions. G.S. Enterprises, Inc., v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991).
The plaintiff alleges that the defendants “excluded Nadal-Ginard from his laboratories at the hospital, destroyed his laboratory specimens and files, obstructed transfer of his grants, and instigated baseless rumors that he had engaged in scientific misconduct.” Thus, the plaintiff has alleged harm under the fourth element of the test; however, it is clear that the plaintiff does not meet the other three elements.
First, while the plaintiff alleges that the defendants obstructed his ability to carry out work on the grants at the hospital, he does not plead any conduct on the part of the defendants which was designed to destroy those relations, between the grant-makers and the plaintiff, which were independent of the three-parly relations between grant-maker, plaintiff and hospital. In his complaint the plaintiff argues that the hospital served as a conduit between himself and the grant-makers. Clearly when the hospital took the justifiable step of severing its relations with the plaintiff, it ceased to function in the capaciiy of conduit. Yet it is this justifiable action alone which forms the basis of the plaintiffs claim, and the plaintiff nowhere asserts that he and the grant-makers had independent relations with which the defendants improperly interfered. In short, there is no allegation that the defendant knowingly induced any third party to break any contract which may have existed between the third-party and the plaintiff, to which the hospital was not a party. (The plaintiffs allegations that the hospital wrongfully dissolved its own contractual relations with the plaintiff are considered below.)
Moreover, the defendant fails to pass the third element of the test. The motives and means of the hospital in meeting the grievous conduct committed by the plaintiff in stealing 5.6 million dollars from the Children’s Hospital are proper. No steps alleged to have been taken in response to the theft approach impropriety. The Supreme Judicial Court requires an offer of proof of “a spiteful, malignant purpose, unrelated to the legitimate corporate interest.” King v. Driscoll, 418 Mass. 576, 587 (1994). While the plaintiff contends that legitimate corporate actions of the hospital have had adverse side-effects on him, the plaintiff does not show any malignant purpose of the hospital unrelated to its need to protect its corporate interests in severing ties with the plaintiff.
The plaintiff also makes a claim for intentional interference with a contract right. Here he alleges that the defendants caused him to lose a salary which he was being paid by Howard Hughes Medical Institute by informing the Institute that the plaintiff was also receiving a salary and benefits from the hospital, in violation of the plaintiffs contract with the Institute. Federal Judge Keeton found the plaintiffs receipt of both salaries to be unlawful. But the plaintiffs claim is that the hospital had no right informing the Institute of his other salary. This claim, however, is muddied by the fact that the plaintiff further contends that the hospital is liable for omitting to tell the Institute more particulars about the relationship between the plaintiff and the hospital. He argues, “Defendants deliberately did not explain that Nadal-Ginard’s [hospital] salary was not for his [Institute] research, but for . . . wholly distinct services.” Thus the plaintiff seeks to have it both ways, and argues that the hospital is liable for giving information to the Institute and also liable for not giving enough information to the Institute.
The situation, however, is quickly cleared up by the Appeals Court in Conway v. Smerling, 37 Mass.App.Ct. 1 (1994). Here the plaintiff was suspected of embezzlement, and the defendant (her employer) communicated his suspicions to a would-be new employer. The plaintiff sued for wrongful interference with business relationships, and the Court held that no such claim was available and upheld the trial court which granted judgment n.o.v. to the employer on this count. The Court held:
An essential element of wrongful interference with advantageous business relationships is that the defendant has acted without lawful cause . .. [Here the defendant] had reason to suppose that [the plaintiff] had been a parly to embezzlement at his company and the facts stated to Talbot were true. In response to an inquiry about a former employee, [the defendant] had a privilege, if not a duty, to speak the truth even if the disclosure of the facts *511 might negatively affect the subject’s job prospects. Id. at 7-8.
The present situation could hardly be more closely analogous, and summary judgment is awarded to the defendants on this claim arising out of their communications with the Institute.
VI. Plaintiffs Breach of Contract Claims (Counts 9 10 and 11) Fail as A Matter of Law Because His Financial Misconduct and Breach of Fiduciary Duty Constitute Antecedent Material Breaches
Nadal claims that the Hospital has breached an alleged contract to guarantee his salary for lifetime employment as a tenured professor with the Harvard Medical School (Count 11). Plaintiff further claims that the Hospital has breached the terms of a separate alleged contract by terminating his appointment as Chairman of the Department of Cardiology (Count 9), which was supposed to have been tied to his tenured professorship. Plaintiff asserts a similar claim on a theory of promissory estoppel (Count 10), arguing that his actions as Department Chairman were fully consistent with the Hospital’s Group Policy Statement and the Operating Agreement between the Hospital and BCHF.
While defendants do not agree that such contracts exist, they nonetheless argue that Nadal’s serious financial misconduct and breach of fiduciary duty to BCHF, as determined by Judge Keeton, constitute an antecedent material breach of Nadal’s duties to the Hospital, thereby excusing the Hospital from further performance under thé alleged contracts.
Even a contract for permanent employment or permanent appointment may be terminated for just cause, such as the employee’s or appointee’s failure “to conform to the usual standards of condúct.” See Boothby v. Texon, Inc., 414 Mass. 468, 480 (1993); Klein v. Presidents and Fellows of Harvard College, 25 Mass.App.Ct. 204, 208 (1987).
Nadal’s position as Chairman of the Department of Cardiology was one of significant trust and confidence. He therefore owed a fiduciary duty to the Hospital, including the duties of loyalty, utmost good faith and of protecting the interests of the Hospital. Chelsea Industries, Inc. v. Gaffney, 389 Mass. 1, 11 (1983); Swaney v. Clark-Wilcox Co., 331 Mass. 471, 475-76 (1954). Nadal embezzled and unlawfully misappropriated at least $5.6 million from BCHF while acting as its President. His position as President of BCHF, an entity affiliated with the Hospital, was necessarily tied to his appointment as Chairman of the Department. The plaintiffs breach of fiduciary duty to BCHF resulted in a breach of his fiduciary duty to the Hospital. Nadal failed to protect the interests of the Hospital when he absconded with the funds of its affiliated entity and used those funds for personal benefit. He failed to conform to the usual standards of conduct for a physician appointed to the position of Chairman of a Hospital Department when he acted in bad faith in the self-interested transactions which formed the necessary components of Judge Keeton’s decision.
Collateral estoppel bars relitigation of any issue that “constituted, logically or practically, a necessary component of the decision reached” in the prior proceeding. In Re Belmont Realty Corp., 11 F.3d 1092, 1097 (1st Cir. 1993). As a matter of law, Nadal’s antecedent material breach of his fiduciary duty to the Hospital excuses the Hospital from further performance under the contracts alleged. Ward v. American Mutual Liability Ins. Co., 15 Mass App. Ct. 98, 100 (1983) (“It is well established that a material breach by one party excuses the other party from further performance under the contract”); Lease-It Inc. v. Massachusetts Port Authority, 33 Mass.App.Ct. 391, 397 (1992) (“Once relieved from performance, the injured party is not liable for further damages incurred by the party in material breach”).
Summary judgment on counts 9, 10 and 11 is, therefore, allowed.
VII. Summary Judgment on the Claims for Conversion and Negligence (Counts 6 and 7) Is Allowed in Part and in Part Denied.
The plaintiff claims that the hospital has destroyed or damaged valuable property of his in the process of severing its relationship with him. Here, as to some of the property, valid issues of material fact do arise. The property at issue is of two kinds: intellectual property and physical property. In his complaint, the plaintiff alleges that the hospital has a policy governing intellectual property which allows a research doctor to patent those of his discoveries which the hospital elects not to patent. He alleges further that the hospital’s failure to notify him of their decision not to apply for patents on certain of his discoveries had the detrimental effect of preventing the plaintiff to seek patents in his own name. While this unfortunate occurrence may indeed have caused harm to the plaintiff, the failure to inform some one of a decision not to patent intellectual property cannot be considered conversion; moreover, one cannot negligently destroy intellectual property.
The law of intellectual property is almost exclusively federal law. As a matter of federal law, “the ownership of the copyright is separate and independent from the ownership of the material object in which it is embodied.” 17 U.S.C. §202, Harris v. Emus Records Corp., 734 F.2d 1329, 1336. (1984). Moreover, under federal law, “a patent owner has no rights under a patent until the patent issues.” E.I. DuPont De Nemours & Co. v. Maillinckrodt, 654 F.Supp. 890 (S.D. Ohio 1987).
As a matter of Massachusetts law, “conversion requires the dominion or control over the personal property of another.” Third National Bank of Hampden County v. Continental Ins. Co., 388 Mass. 240, 244 *512 (1983). To convert the specimens and computer files does in fact amount to control over the plaintiffs personal property. However, one cannot convert the plaintiffs intellectual property even if one converts the specimens and flies, since ownership of each is distinct and to steal one is not to steal the other. See E.I. DuPont, supra, at 890. The plaintiffs alleged future intent to patent his inventions does not confer ownership even on him, since no ownership rights attach until the patent is granted. See Id. Thus, the defendants cannot convert what the plaintiff does not own. Similarly it is impossible for the defendants negligently to damage this inchoate abstract property right.
Beyond the intellectual property, however, the plaintiffs physical property in the form of biological specimens, the record-keeping system relevant to these specimens, and computer disks containing scholarly papers are all alleged to have been destroyed by the defendants. The defendants allege that the plaintiff has been given a satisfactory computer tape and that the specimens are all being kept in a locked freezer. This is an issue of fact, inappropriate for summary judgment. Accordingly, as to the biological specimens and computer tapes, and on these two counts alone, summary judgment is partially denied. Summary judgment is partially allowed, as to the intellectual property.
VIII. G.L.c. 231, §85W Absolves the Individual Trustees of Liability.
The unpaid individual trustee defendants (Bain, Boyan, Castaneda, Jackson, Karp, Kidder, Labovitz, McNay, Nathan, Phillips, Pierce, Spaulding, and Walsh) are absolved from liability by the charitable immunity statute, c. 231, §85W, because they serve without compensation.
IX. Partial Summary Judgment is Granted As the Liability Cap Under G.L.c. 231, §85K Limits Damages
Massachusetts General Laws, c. 231, §85K limits liability of charitable institutions with respect to tort claims. The charitable immunity doctrine was adopted by the Supreme Judicial Court in 1876, specifically in reference to a hospital. In that early decision, “[t]he court reasoned that the hospital held its funds in trust for the benefit of the public, and that it would be an unlawful diversion of those funds to apply them to the satisfaction of a judgment based on the negligence of hospital agents.” English v. New England Medical Center, 405 Mass. 423, 425 (1989), cert. denied, 493 U.S. 1056 (1990). The early decision of the Court is still good law, and the Court has more recently held in respect to another hospital:
The objective of §85K clearly is to protect the funds of charitable institutions so they may be devoted to charitable purposes ... If a charity’s property were “depleted by the payment of damages its usefulness might be either impaired or wholly destroyed, the object of its founder or donors defeated, and charitable gifts discouraged.” Id. at 429.
Accordingly, the hospital is not liable beyond the statutory limit.
ORDER
Based upon the foregoing it is hereby ORDERED that defendants’ motion for summary judgment be ALLOWED as to Counts 1, 2, 3, 4, 5, 8, 9, 10, 11 and 12. Summary Judgment is ALLOWED in Part and DENIED in part as to Counts 6 and 7. Further, partial summary judgment is entered capping damages at the statutory limit.

The complaint referred to is the Amended and Supplemented Complaint dated December 22, 1994.

Boston Children’s Heart Foundation, Inc. v. Bernardo Nadal-Ginard, Civ. Action No. 93-12539-REK, (D.Ct. Mass.) December 1994.

Commonwealth v. Bernardo Nadal-Ginard, Suffolk Crim. Action Nos. 94-10150 and 94-11198 (McEvoy, J.) June 1995.

Defendants are arguing that non-mutual defensive collateral estoppel applies.

Arguments on the appeal were scheduled for August 4, 1995. A decision from the First Circuit is pending.

Plaintiff raised the arguments in support of staying the decision on this motion at oral argument, at this court’s suggestion.

Genuine issues of material fact will be addressed in relevant sections of the DISCUSSION which follows.

In particular, plaintiff states that defendants informed the Howard Hughes Medical Institute (“HHMI”), for whom the plaintiff was investigator in charge of a research lab located on the Hospital premises, that Nadal had been receiving compensation from BCHF as well as from HHMI, and that following this revelation HHMI terminated its affiliation with Nadal.

The computer tape must be read by a particular type of computer system (VAX mainframe) to which Nadal does not have access, rendering the tape unusable by him in its current format. The plaintiff does not concede that the tapes are a complete record of his files.

If, for example, the First Circuit reversed Judge Keeton on claims which support defendants’ motion herein, then this court’s decision on summary judgment based upon such rulings might require reconsideration. However, Judge Keeton’s findings of fact are much less likely to be found in error and it is his fact-finding function which is more centrally at issue in applying collateral estoppel.